THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN N. PRANTE, Defendant-Appellant.

Fifth District    No. 5—83—0837

Opinion filed October 3, 1986.

Sherwood & Kassin, of Bethalto, for appellant.

Dick Allen, State's Attorney, of Edwardsville (Kenneth R. Boyle, Stephen E. Norris, and Raymond F. Buckley, Jr., all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE JONES delivered the opinion of the court:

Following a three-week jury trial in June and July of 1983, the defendant, John Prante, was found guilty of the murder of Karla Brown and sentenced to the Department of Corrections for a term of 75 years. He appeals, presenting six issues for review: (1) whether the evidence was insufficient to prove the defendant guilty beyond a reasonable doubt "in that the prosecution failed to prove criminal agency on the part of the defendant or that he committed any act which caused or contributed to the death of the deceased"; (2) whether it was prejudicial error for the court to allow the People's instruction No. 7, based upon Illinois Pattern Jury Instruction, Criminal, No. 3.02 (2d ed. 1981) (hereinafter cited as IPI Criminal 2d) without the "bracketed" material since the prosecution's case was based on circumstantial evidence; (3) whether "[t]he prosecution's tactic of improperly introducing and indicating to the jury in opening statement and under it's [sic] case-in-chief, the defendant's prior extrajudicial statements as substantive evidence rather than for the limited purpose of impeaching testimony of witnesses, denied the defendant a fair trial and due process of law in accordance with Fifth Amendment to the United States Constitution"; (4) whether "[t]he prosecutor's conduct during the course of the trial compounded the aforementioned error and resulted only in inflaming the jury"; (5) whether expert testimony concerning bite marks should not have been permitted "because of its exclusionary nature and its improper conclusiveness of the guilt of the defendant"; and (6) whether the defendant's motion for a change of venue should have been allowed "as a result of the use of the press as an investigative tool by the prosecutor." In his reply brief the defendant contends that he was denied the effective assistance of counsel. The State moved to strike those portions of his reply brief raising that issue. The State's motion and the defendant's objection thereto were taken with the case.

At trial the State called over 50 witnesses. On June 21, 1978, at about 5:45 p.m. the police department of the city of Wood River received a call to come to 979 Acton concerning the death of Karla Brown, who, with her boyfriend, had moved to that address the day before. The seminude body of this 22-year-old woman had been found in the laundry room in the basement of the house some minutes earlier by her boyfriend, Mark Fair, returning from a day at work, and a

friend, Thomas Feigenbaum, who was at that time using his truck to help Mark Fair move some large items to the house on Acton. The victim, about 4 feet 11 inches tall and weighing about 100 pounds, was found with her head and shoulders immersed in water in a large metal lard can that had been used to store winter clothes. Her hands were tied behind her back with a white extension cord from which the ends had been cut. Her stiffened body was bent over the barrel at the waist. Nude below the waist, she was wearing a heavy sweater that was buttoned and that she usually wore only for social occasions in cold weather. Two men's socks, tied together, were tied tightly around her neck. She had a large gash on her forehead, a cut on her nose, and a large gash on her chin. The area where the socks had been tied around her neck was bruised. The socks had been kept in a dresser drawer in a bedroom upstairs, the extension cord had been packed in a box in the basement, and the clothes in the lard can had been dumped on the basement floor. A couch in the basement was blood soaked, and blood was splattered on the basement floor. The bloodied cushion was heavily saturated with water. On a coffee table near the couch was a blood-stained tampon. At one end of the couch a stand of TV trays was overturned. A coffee pot from the couple's coffee maker was found in the rafters of the laundry room. The entrance at the rear of the house leads directly to the basement.

The police secured the crime scene. All of the State's witnesses who had been at the scene testified that, with the exception of Mark Fair and Thomas Feigenbaum, only medical and law-enforcement personnel were or could have been at the scene. According to their testimony, the defendant was not there at any time and could not, because of security, have been anywhere in the house at 979 Acton after the police arrived. No information was distributed to the public. The occupant of the house next door at 989 Acton was Paul Main, a friend of the defendant. One of the police officers, Charles Nonn, who arrived at the scene at about 6:20 p.m., had known the defendant for four or five years prior to the time of the murder and testified that he saw the defendant standing outside with Paul Main when the witness arrived to investigate the crime. Although the crime scene was processed for fingerprints, those identified, with the apparent exception of one, were the victim's. No fingerprints of the defendant were found at the scene. There was testimony that in such a case the police would expect to find more fingerprints than were actually found.

The State called as witnesses persons who had spoken with the victim on the telephone on the morning of June 21, 1978. At about 9:30 a.m. that day the victim had called Jamie Hale, a friend, and

seemed to be fine. When Jamie Hale tried to call the victim that same day at about 2:30 p.m., she got no answer. At about 10 a.m. that day the victim had called Debra Davis, who left shortly thereafter to visit the victim. When she reached the victim's residence at about 11 a.m., no one answered either the front or the back door, although the victim's van was at the house. She tried to telephone the victim at about 11:45 a.m. or 12 p.m. and repeatedly throughout the afternoon but got no answer. At about 9 a.m. that day the victim called Helen Fair, the mother of Mark Fair, who returned her call between 10 and 11 a.m. The conversation was interrupted by the victim's saying, "Helen, someone is at the door, and I'll call you back." When the witness did not hear from the victim, she tried to call her between 12 and 12:30 p.m., but there was no answer.

Eric Moses, who was 11 years old at the time of trial and 6 years old at the time of the murder, testified that he had lived in the house at 979 Acton and that on June 21, 1978, while his grandmother was taking him to a dental appointment in the area, he forgot to tell her where the dentist's office was. To turn around she used the driveway at 979 Acton, at which time, about 10:45 a.m., the witness saw a woman, matching the description of the victim, and a man talking in the driveway. Edna Moses, Eric's grandmother, testified similarly and stated that, as she was turning around, the woman started to walk toward the house.

On the date in question Edna Vancil, the aunt of Paul Main and his sister, Elizabeth Westbrook, lived across the street from the residences of the victim and Paul Main. The witness testified that on that morning Elizabeth Westbrook visited her, having arrived between 9:30 and 10 a.m. in the defendant's car. The defendant, she said, went to Paul Main's house and sat on the front porch with Paul Main until about 11 a.m., when the two "disappeared" until almost noon, at which time they resumed sitting on the porch until about 3 p.m., when the defendant left in his car. She testified that she did not see him or his car the rest of that day.

John Scroggins, who knew both the victim and the defendant, testified that on the afternoon before the murder, he and the defendant had been at Paul Main's, at which time he introduced the victim and the defendant, who afterward on that same day expressed considerable sexual interest in the victim.

According to testimony by an employee of the Shell Refinery, seemingly located in the St. Louis, Missouri, area, the defendant had submitted an employment application there in person sometime between 8 a.m. and noon on June 21, 1978. On an employment applica-

tion to Aerco Industrial Gases dated June 19, 1978, the defendant listed as his first reference Spencer Bond.

The State put on evidence that the victim had been a student at Southern Illinois University at Edwardsville in 1975 or 1976 and was a student there for three years.

In the summer of 1980 Alva Busch, a crime-scene technician with the Department of Law Enforcement, was investigating the case and felt that two new techniques, unavailable at the time of the murder, might aid the investigation: green laser, used with respect to finger-prints; and image enhancement, which was being used to identify in-struments that had made wounds and to identify bite marks. In mid-August of 1980 police sent Dr. Homer Campbell of the University of New Mexico all of the photographs they had of the crime scene. Dr. Campbell wanted the TV trays and tray rack hand carried to him and found blood on the bottom of the rack. Dr. Campbell indicated that certain marks, in the area of the victim's right collarbone, were bite marks. Prior to this time no one who had examined the body or worked on the case had been particularly familiar with bite marks or had thought that there were any on the body of Karla Brown. In the spring of 1982, according to Agent Randall Rushing of the Depart-ment of Law Enforcement, an investigation plan was developed to take photographs of the crime scene to a "profile man" by the name of Douglas, at the FBI Academy at Quantico, who provides psycholog-ical profiles of criminal suspects. At that time the investigation fo-cused on Paul Main and had not yet focused on the defendant. As a result of the meeting with Mr. Douglas, the police decided to proceed, with the agreement of the victim's family, to exhume the victim's body. The police believed that "after four years the killer had become complacent, and a high profile was developed in order to make the killer nervous." To promote the plan "[a] high amount of coverage profile by the media was generated." Articles appeared in newspapers of the area concerning the impending exhumation, the existence of bite marks on the body, and technological advances in forensic science since the time of the murder. On June 1, 1982, Karla Brown's body was exhumed and a second autopsy performed.

At the first autopsy on June 22, 1978, Dr. Harry Parks, the pa-thologist who performed it, observed two large lacerations on the face, a fracture of the jaw at the tip of the chin, and several bruises, especially severe around the throat and consistent with strangulation, which was, in his opinion, the cause of death. He estimated the time of death to have been about six hours before the body was found at about 5:45 p.m. The time of death could, he said, vary by as much as

two to three hours. Because he observed no water in the lungs, he was of the opinion that the victim was not breathing at the time her head was submerged in the water. He palpated no skull fractures and at the time noticed nothing indicative of human bite marks. He testified that at the time he did the autopsy he knew very little about bite marks and had heard very little about their usefulness as evidence.

On June 2, 1982, following exhumation of the body, Dr. Mary Case performed the second autopsy. She found that the jawbone had been broken in two places by a single blow and that the skull had been injured in three places by three blows of significant force with a blunt instrument. A blow to the back of the head had caused a fracture of the strongest portion of the bone of the head. The witness was of the opinion that the cause of death was drowning because of the presence of foam around the nose, indicating that the victim had had respiratory movements under the water. The witness was of the further opinion that the victim had been sexually assaulted. She testified that bite marks in the area of the right collarbone had been inflicted at about the time of death when the other injuries were inflicted and not, for example, two days earlier or even one hour earlier, because microscopic slides of that tissue showed fresh hemorrhage in the subcutaneous tissue with no inflammation.

Agent Thomas O'Connor of the Department of Law Enforcement testified that on July 1, 1982, at about 3 p.m. he had interviewed Vickie White at her place of employment; at about 5:45 p.m. that same day he had interviewed Mark White, her husband; after 10:30 p.m. that same day he had talked with Roxanne Bond; and later that same evening he had interviewed her husband, Spencer Bond.

Vickie White testified that she had known the defendant for about eight years. She said that not more than three days after the murder of Karla Brown had occurred she and her husband, Mark, were visiting during the weekend with Spencer and Roxanne Bond in the kitchen of their house in East Alton when the defendant came in and began to talk about Karla Brown, saying that he had known her when he had gone to "SIU." The witness testified that "Prante had stated that she was murdered and that her body was down in her basement, and she was in a curled up position, and she had teeth marks on her body." When he made the remark about the teeth marks, she said, "[h]e put his arm over his shoulder." She stated further that the defendant had

> "said that he had been there that day—the same day she was murdered. Prante said that she [*sic*] was there the same day that she was murdered, and he talked about, you know, her

body being in the basement and she was in a curled up position. She had teeth marks on her body, and that's when he pointed over his shoulder. And he—he had made the statement that he had to get his story straight and he had to get out of town because the police were looking for him."

The witness stated that the defendant had "said he had to get his story straight with Paul Main because they was [*sic*] in some trouble and that he had to get out of the State." The defendant said he had been at Karla Brown's house "earlier that day," that she was all right when he left, and that he was supposed to go back to her house. The witness said that she had been walking in and out of the room during the conversation but that she had heard most of it. She testified that newspaper articles concerning the exhumation had brought her attention to the matter. She said she had not read any articles about the murder until she read those concerning the exhumation and had heard about the murder, at first, from the defendant and, later, at work. In 1978, she said, when she had heard the conversation, she was unaware of its significance with respect to the investigation.

Mark White testified that he had known the defendant for about seven years and would see him "[v]ery rarely, maybe three, four times a year." The witness had heard about the murder a day or two after it had occurred. He said that within three days after he had heard about the murder he and his wife were talking in the Bond's kitchen on a weekend when the defendant came by. The defendant brought up the subject of the murder and said of it "that he had been over to [Karla Brown's] house and they were just talking about her; that he knew her, and he was supposed to go back later on in the evening; and I don't know if he ever did or not." The defendant stated that "he was going to have to leave town because of something that had happened, and he was afraid he was going to jail for it." The defendant said that he was going to be questioned because of her murder and that he was afraid he could have been the last one to see her alive. The witness indicated that during the conversation he would leave the kitchen to go to the bathroom and to check on the children as was necessary. He said that in 1978 he attached no significance to the conversation and told no one about it until the police approached him in 1982.

Roxanne Bond testified that she had known the defendant eight or nine years and that he had been "a good friend of ours," coming by their house "every couple of days or so." She had read about the Brown murder in the newspaper and had not heard the defendant's conversation in her home because she was outside with her child. She

did, however, once hear him say that he "had to get his story straight."

Spencer Bond testified that he had known the defendant for 9 or 10 years, the two having met at Lewis and Clark Community College. At the time of the murder he usually saw the defendant about once a day, either at his house or the defendant's. The witness first heard about Karla Brown's murder from the defendant on what he recalled as a Friday night, "[a]t the most three days" after the murder occurred. Vickie and Mark White were in the kitchen of his house with him and his wife, Roxanne, when the defendant came over. The defendant said he had been at Paul Main's house "that day" and "had talked to Karla Brown about two or three that afternoon, was supposed to go back and see her because he might have a possible date with her." The defendant stated that he had talked with Karla Brown at her house. The defendant said further that "the girl was in a curled position stuck in a pail of water down in the basement." The witness testified that when the defendant told him that fact, he, that is, the witness, had no idea that that was what had happened. The defendant said that "she had teeth marks on her shoulder where she had been bitten on her left shoulder," gesturing as he made the statement. The defendant said also that the victim had been tied up. The witness stated that the defendant said that on the day of the killing "he was over at Paul Main's house. They were over there getting drunk and getting high. Paul Main had been painting the house next door." The defendant stated that "he had put in a few applications at work; that he had talked to Karla Brown over at her house." Of the police the defendant said that they "were over the place and that they really fowled [sic] it up really bad; that they really didn't know what they were doing; that there was everybody in and around the place even people that shouldn't have been there." The defendant stated that he and "Paul had to get their stories together as to what they were doing that day" for the reason that "they didn't want to get conflicting statements of what their statements were so the police wouldn't be able to crack his alibi." Prior to the victim's death the defendant had mentioned her name "several times" to the witness "within a few days to a few weeks before it happened." The witness first told the police about these statements by the defendant on June 1, 1982, when the police came to talk to him. Prior to his interview by the police he had not talked to Vickie or Mark White about the defendant's statements. At the time he talked with the police the witness said he "didn't think I knew anything" and that before that time he did not realize the significance of the information he had.

Thereafter the witness participated in a wiretap of the defendant conducted by the police on June 2, 1982, and again on June 4, 1982, after the defendant had said he wanted to speak with Spencer Bond again about the conversation of June 2, 1982. In the first taped conversation between the defendant and Spencer Bond, the transcript of which was read to the jury, the defendant said that on the day of the murder he and Paul Main "were gett'in [sic] drunk and high the day, you know, right next door." He said he "didn't even know about it until a few days later in the paper. Then the third day after that an officer wanted to talk to me about it." During the conversation the defendant said, "I never even knew the girl," and, "I didn't even know what her name was until I saw it in the paper." When Bond said to the defendant, "You told me, you were the last one to see her alive or somethin [sic]. That's why you—," the defendant said, "Me and Paul, we saw her putterin' around outside and everything." When Bond mentioned that "[t]here was something about a bucket of water was in there—," adding "— a bucket or a pail or something— don't remember nothing about that, huh?" the defendant responded, "Didn't pay any attention to that even, not even when it happened, none of my business." Shortly thereafter the defendant said, "About all I can remember of that is, ah, back in the papers were say'in [sic] ah, got put in a trash can."

In the wiretap of June 4, 1982, the defendant initiated conversation about the case and stated that on the day of the murder he was at Paul Main's drinking wine and smoking "a little pot on the front porch." The defendant said he had been there "[a]pproximately eight to ten hours from ten to eleven in the morning till four, five, six, seven in the evening. He gave varying times." According to the witness, the defendant stated that he and Paul had left Main's house that day "a few times to get some more wine and beer." The defendant stated that when Mark Fair arrived home, the defendant saw him

> "[A]rrive and come out of the house. Then a bunch of police were there. He said three or four cops were coming around and were scrambling all around the place, and he said the ambulance came; and then when the coroner's wagon came he said, 'Wow, the girl must have been dead over there,' and he said it's time for him to get out of there."

The defendant stated further that he had never been over at the victim's house but that he could have talked to her in the walkway up to the house. Asked, "Did he say whether or not he was ever able to gain entry to the house any time that day?" the witness answered, "He said no way; that the police—After the police got there there was

no way. They sealed the premises off. There's no way he could have even got on the property." The defendant said that he had "never even" known Karla Brown and had seen her only "once or twice." The defendant said that he had first found out about the killing "[a]bout three days after the murder when the police came to talk to him at his parents' house" or else "somebody mentioned it out at his parents' house that there was a girl killed down on Acton."

After the second wiretap of the defendant Spencer Bond spoke with Paul Main from about 1 a.m. until about 3:30 a.m. on June 5, 1982, in a conversation wiretapped by the police. Later that day the police interviewed Paul Main for six or seven hours.

Judy Main, the wife of Paul Main, testified that the day after the police spoke with her husband on Saturday, June 5, 1982, the defendant came to their residence in Brighton while she was there to talk to her husband about the Brown murder in order to "figure out how—what they had done" on the day of the murder. The defendant told her husband that they "had partied all day that day." She said, "They talked at some length about the day of the murder. They tried to figure out what day of the week it was. At one point John Prante talked about the fact that Karla Brown's murder was a capital offense and was punishable by death and that one of them would go to the gas chamber for it." The witness and Paul Main had been married about two years at the time of trial.

Agent Rushing testified that on June 8, 1982, he, together with Chief Greer and the State's Attorney, took the dental impressions of the defendant, of Paul Main, and of Joe Seitz to Dr. Lowell Levine in New York. In an effort to locate the defendant upon returning from New York later that day, the witness learned that the defendant had been to Paul Main's residence on Sunday and that Paul Main's account was different on June 8, 1982, from what it had been earlier when police had spoken with him. On June 8, 1982, Paul Main was charged with and held for obstructing justice by virtue of having lied to the police, and the defendant was arrested. Paul Main did not testify at the defendant's trial. From the defendant's automobile police seized two white electrical cords with no male or female ends.

Susan Lutz testified that she had met the defendant in 1980 or 1981 and that they had dated for a while. She stated that once when she and the defendant were in bed "[h]e kind of whispered in my ear that he had killed a woman." Expressing disbelief at first, the witness later asked the defendant, "Did you really kill somebody[?]" to which he responded, "I can't really talk about it because I'll lose my freedom." Asked why he had killed the woman, the defendant had an-

swered that he was "mad." The witness said that "there was a couple times he bit me on the neck, and it made me mad." He had, she said, bitten her on her left shoulder.

Ada Pollard testified that on June 21, 1978, the defendant had come to her house on Hamilton Street in Wood River in the afternoon "and told us a girl had been murdered in Wood River." She said that Paul Main arrived there later. Harold Pollard of the same address testified that he had known the defendant since approximately 1972, when they had met at Lewis and Clark College, and that in 1975 they had shared a house trailer together for about a year. He testified that it would take about 10 minutes to drive from Paul Main's house on Acton to his mother's house on Hamilton and about 40 minutes to walk that distance. The witness testified that on June 21, 1978, the defendant had driven to his house around 6:30 or 7 p.m. seeking tranquilizers. The witness had advised the defendant that the doctor had given him just enough for his own use and that he should see a doctor if he wanted medication. The defendant said that he did not want to see a doctor and that "he had just come from over at Paul Main's house, and he said—stated that the girl living next door to him had been either murdered or killed. I can't recall the exact phrase he used." He and the defendant talked for between a half hour and an hour. The defendant said that "there was a lot of police over there and that they made him very nervous, and he reiterated, you know, that the girl had been killed, and I—I asked him how he knew, and he said well he says he got a glimpse of the girl by looking over the policeman's shoulder at the crime scene." The defendant said "that the body was found curled up on the floor with its hands tied behind its back." The defendant stated "he had access to the view by looking around the policeman or, you know, sticking his head inside of the house or something to this effect." The witness said, "To the best of my recollection he said he had looked over a policeman that was standing in the door. He looked over his shoulder, something to this effect." The defendant said of his activities that day "that he had been over at Paul's—Paul Main's house most of the day smoking—smoking pot and drinking beer." After the defendant had related this information to the witness, Paul Main arrived on foot at Harold Pollard's residence. A day or two before the murder the defendant had told the witness, in the words of the defendant, "that a nice looking blond chick had moved in next door and that he wouldn't mind getting some pussy off her."

Dr. Homer Campbell, a dentist and the chief consultant in forensic dentistry for the State of New Mexico, whose area of research is pho-

tographic enhancement and its application to forensic dentistry and forensic pathology in the analysis of injury patterns, testified that, in his opinion, the injuries to the victim's forehead, nose, and chin were caused by the base and wheels of a television tray stand. He described the human bite as ovoid in shape and stated that in a human bite most frequently only the front six teeth will mark. He said that very frequently a bite mark is "totally overlooked, or it is not recognized as an injury pattern." In photographs of the victim, the witness identified at least three bite marks overlapping one another. On the basis of the spacing of the defendant's teeth, which contained a space between each one of the top six front teeth, the witness was of the opinion that the defendant's teeth were consistent with the victim's wounds in the area of the right collarbone, photographs of which showed marks made by top front teeth with such spacing between them. The witness described Paul Main's teeth as severely crowded with no spacing between them at all and expressed the opinion that Paul Main's teeth could not have caused the injury pattern in question. The witness expressed the further opinion that the teeth of Joe Seitz, a model of whose teeth he had also examined, could not have caused this injury pattern. The witness testified that nothing about the quality of the photographs of the victim concerned him with regard to his opinion that the defendant's teeth were consistent with the wounds in question. The witness indicated that anyone viewing the body, clad in the buttoned sweater and bound about the neck by the two socks tied together, could not possibly have seen the bite marks on the body because they were covered.

Dr. Lowell Levine, who was qualified as an expert in forensic dentistry, testified that there were two or three human bite marks, some of which were superimposed upon one another, shown in the photographs of the victim. The witness was of the opinion, on the basis of the spacing pattern of the defendant's upper front teeth, that the defendant's teeth could have caused the injury pattern in question on the victim's body and that the teeth of Paul Main and Joe Seitz could not.

Dr. Ronald Mullen, the defendant's dentist, testified that the defendant's dental impressions reveal multiple spaces, called diastemata, in the upper front teeth. The witness stated that he has practiced as a dentist for 17 years and has treated 6,000 to 7,000 patients; he estimated that spacing between all six upper front teeth occurred in less than 1% of his patients. On cross-examination he estimated that he had seen such spacing "less than fifteen" times.

Commander Ralph Skinner, who was chief of police for the city of

Wood River at the time of the murder, testified that on June 24, 1978, he had interviewed the defendant, who told him that he went to Paul Main's house quite often, that he had been to Paul Main's on the evening of June 20, 1978, when the people at 979 Acton appeared to be moving in, and that on the day of the murder he had gone to Paul Main's house at about 8:30 a.m. to see if Main would like to go to St. Louis with the defendant to pick up some employment applications while the defendant dropped some off. The defendant had said that Main was unable to go with him, that he went alone, and that he next saw Main at about 6 p.m. at Harold Pollard's house in Wood River. The defendant told the witness he had learned of the murder at that time, when Main told him that the girl next door had been killed, although Main did not know how she had been killed.

Eldon McEuen, an officer for the Wood River police department, testified that on July 5, 1978, he interviewed the defendant concerning the investigation. In reviewing some reports the witness had noticed "a discrepancy in some information given by Mr. Main and Mr. Prante." The defendant told him that on the day of the murder he had placed an application with the Shell Oil Company and had then gone to Paul Main's house to see if Main wanted to go with him to place applications for jobs elsewhere. Because Main was busy painting a house in the area, the defendant said, he left and placed some job applications in the St. Louis area, namely, Rockwell International, McDonnel Douglas, and Aerco. The witness testified:

> "Well, I asked him if he had returned to Main's house, and he told me he wasn't sure if he did or didn't. He couldn't account for some of his time. The next thing he told me was he remembered he had been on Hamilton Avenue in Wood River, and Paul Main had came [sic] to that address and advised him Karla Brown had been murdered."

On cross-examination the witness testified that the defendant had stated that he sometimes had trouble remembering things from one day to the next.

Richard White, an investigator for the Wood River police department, testified that on June 4, 1982, he and Chief Greer had gone to the defendant's residence to obtain his cooperation with regard to the making of dental impressions of his teeth. On the way to the dentist's office, the defendant initiated conversation concerning the case, saying

> "that he remembered the Karla Brown murder and that the day that the murder occurred he remembered it because he was at Paul Main's house. They were sitting on Paul's front porch.

I think he said they were drinking wine, and he remembered seeing the police cars come to the house, and they got up and went inside."

The witness said that the defendant stated that he had seen the victim "that day puttering outside in the yard, but he didn't remember what time that was he saw her."

Agent O'Connor testified that on June 8, 1982, at about 10:30 p.m., he and Agent Rushing were at the defendant's residence for the purpose of arresting him. After the defendant was told that he was a suspect in the case and advised of his constitutional rights, having initialled his rights to indicate his understanding of them, the defendant stated that he had contacted Don Weber, the Madison County State's Attorney, and had "told Mr. Weber that he did not want to be considered as a suspect in the ongoing investigation, and that he also told Mr. Weber that he was at the Karla Brown residence on the day of the murder and that he had arrived sometime in the afternoon." The defendant stated further to the witness "that when he made the phone call to Mr. Weber and advised Mr. Weber that he had been at the Karla Brown's [*sic*] house on the day of the murder that since the time of that phone call that that statement was incorrect; that he had not been at Karla Brown's residence on the day of the murder." The defendant had said

"that the reason he had changed his mind about the conversation with Don Weber was between the time he had talked to Don Weber he had also had a conversation with a Mr. Paul Main in that a Mr. Paul Main had advised him that he was present at Karla Brown's house the day prior to the homicide rather than the day of the homicide, sir. That was the basis for changing his statement."

Agent Rushing testified that on June 8, 1982, at about 10:30 p.m. he and Agent O'Connor had gone to the defendant's residence and, prior to talking with him, had advised him of his rights. The defendant was asked about his telephone conversation with the State's Attorney in which, according to the witness, the defendant had said he did not want to be considered as a suspect in the investigation and that he had been at the victim's residence on the day of the murder and had then said that the statement was incorrect. The witness stated that the defendant said that

"[T]o the best of his recall he was not at Paul Main's residence, the residence adjacent to the Karla Brown residence, on the day of the murder at all; that he did not recall being there; that he was there on the day prior to which was June 20th; and he

stated he recalled that now because he had been to Brighton or he had been to the Paul Main residence and talked to Paul Main, and at that time he was convinced that he was not at Paul Main's residence on the day of the murder."

Advised that the witness had heard him on a wiretap describe the events of the day of the murder, the defendant stated "that he didn't care what any witness said. He was not there on the day of the murder." The defendant said he "could not recall his location on the day of the incident. *** He stated that he did recall putting in an application at Shell, but he was uncertain as to whether it was that day or not." The witness testified:

"In the question we asked him if he had met her at school, and he stated that he had not; that he did not know her; that he had only seen her on one previous occasion and that was approximately a day before the murder, and she was seen out in her front yard; that he saw her out in her front yard. He did not make acquaintance with her at school."

The defendant said "that he had not been inside the Karla Brown house at all."

The defendant called 17 witnesses, several of whom were character witnesses who had become acquainted with him since the date of the murder. One of defendant's witnesses was Jerry Gibson, who, in 1978, was incarcerated in the Madison County jail with Joseph Milazzo, who had stated to the witness within two months of the Brown murder that he had killed Karla Brown by strangling her. The witness said, "I forget if he said he strangled her with a scarf or pantyhose." Milazzo apparently had indicated that he had gained access to the house through a window. The witness admitted on cross-examination that he had first told police about Milazzo's statement when the witness was attempting to make a "deal" for himself.

The defendant put on evidence to show that he had attended Southern Illinois University at Edwardsville at various times in each year from 1975 through 1979 and in the fall of 1981 and the winter of 1982.

The defendant's sister, Jo Ellen Brady, testified on cross-examination that about the crime the defendant had told her, "I'm probably going to get called on this one because I was right next door when it happened." Another of defendant's witnesses, Leonard Chairney, testified on cross-examination that the defendant had told him that he had been at Paul Main's house on the day of the murder. Asked, "What else did he tell you about the day of the killing?" the witness answered, "He said he was at Karla Brown's house, and that was

next door, and that he was sitting on the front porch, the police came up, he left, and he didn't do it."

Dr. Donald Ore, a pediatric dentist who was qualified as an expert in photography, testified that in the photographs of the victim's wounds there is no reference to scale so that they do not show the size of the victim and they do not indicate the magnitude of enlargement.

Dr. Edward Pavlec, an orthodontist, testified that because of the absence of a scale or standards he found very little evidence "to even substantiate that we have a bite mark. If we do have a bite mark, I have many points that I can't answer; why it would make a straight line configuration, and if that is the case, if these happen to be teeth, I can't measure the teeth because there are no scales there." He was critical of the failure to have photographed the marks in question at right angles, which failure precludes accuracy in measurement. He expressed concern that pulling of the victim's skin by, apparently, the pathologist at the time one of the photographs was taken could cause distortion and possibly increase the size of the spaces between the marks. He classified the photographs of the wounds in question as "one step above useless" for purposes of comparison. On cross-examination the witness stated that the defendant's teeth could have left the mark on Karla Brown's shoulder. On redirect examination he found that marks made by three of the defendant's and Joe Seitz' front teeth were "very similar." He stated that the "[b]ite mark would have to be considered as the primary trauma in the neck area."

Dr. Norman Sperber, a dentist in San Diego, California, who was qualified as a forensic odontologist, testified that if a picture of marks on a body is not taken at the proper angle of 90 degrees, there will be gross distortion and the mark can assume a shape other than its actual one. By way of illustration, the witness used photographs of circular labels, which appear round when the picture is taken at a 90 degree angle but which become ovoid in shape and "flatten out" when the picture is taken at a slight angle; to the extent that the camera is not perpendicular to the subject, the distortion increases. The witness stated that, in the absence of color and rulers and in the presence of distortion, the State's black and white photographs, which he described as "dirty" photographs because of the presence of blood on the body, were "unusable" with reference to analyzing them for bite marks. On cross-examination the witness said that the defendant's teeth could have made the marks shown on the victim's shoulder.

The defendant testified in his own behalf that he had "virtually no memory of it, but things have come together in this last year." He

said he recalls arriving at Paul Main's house on the morning of the murder, leaving, and then returning. He had gone to Paul Main's to see if Main wanted to put in job applications with him. He estimated that he returned to Paul Main's house "from about ten to twelve or one" and said that he "sat around" with Paul Main on the front porch. As to how long he was on the front porch he said, "I just—I keep having this feeling that I was there all day; that I stayed the entire day; that it just keeps coming to mind." He recalls that in the evening, before sundown, he left. During the time he was at Main's he left the porch, possibly, to go to the store, to look at the house Paul was painting, and "to go inside because I remember seeing police cars pull up, and at that time it just wasn't reasonable to sit there smoking a joint and getting—drinking." He stated that 3 to 10 policemen arrived and were "walking all over." He left Paul Main's, he said, around "4:00 or 5:00, maybe 5:30 or so, 6:00, somewhere there." He testified:

> "It keeps feeling right to say that I went to Harold's mostly because I can recall going to Harold's, and I can recall at another time or that time that Paul came over. This stuck in my mind that Paul showed up, and he—he was shook to some degree, and he went on to explain more about what was going on over there at Karla's."

He said that the next time he heard about the death of Karla Brown was at Spencer Bond's house "[a] matter of days, a matter of a week or so later." The topic came up, he said because Spencer was joking, suggesting that the defendant had committed the crime. He recalled that Spencer Bond had brought the subject up "at least three or four times maybe within a month's time." He stated that he remembered talking to the police but was "confused about that." When he talked to Commander Skinner shortly after the crime had occurred, he had found it difficult to remember what had happened on the day of the murder. Of the interview with Officer McEuen, the defendant recalled only being photographed. About his conversations with Spencer Bond in June of 1982 the defendant said: "He was saying things that I just never knew. He was saying things about buckets of water, and he's saying things about bite marks, and I'm 'Wait a minute, what are you talking about, man?' " The defendant indicated that Spencer Bond was threatening to go with "three or four people" to the police and that, as a result, he talked, among others, to "Mr. Weber about it, offered my help." He had never, he said, told Susan Lutz that he had killed anybody. He stated that the wires seized from his automobile had been purchased by him in 1980 from U-Haul as a "towlight kit"

in order to tow a car. He denied having killed Karla Brown.

On cross-examination he explained his statement to Commander Skinner on June 24, 1978, that he had not gone back to Paul Main's house at all on the day of the murder by saying, "Well, it's—I don't know, memory problem." He added, "Memory or confusion." He testified that he had never met the victim and did not know her name prior to the killing. He said he did remember "Paul coming in into Harold's house. Be it the night of the murder, or the day after, or five—five weeks later I'm not sure what day, but, yes, I recall Harold and me sitting around and Paul coming in and telling us about it." He "guess[ed]" that he had first learned that Karla Brown was dead when Paul Main told him so at Harold Pollard's. Of the conversation with Richard White on June 4, 1982, when his dental impressions were made, he said, "I don't remember ever talking to Rick White but I do remember the incident of seeing Karla out there in the front yard puttering around the yard." He thought that occurred on the day of the murder but did not "know." He said the time he saw her "had to be morning or midafternoon, early afternoon. The clothes were different from what you have showed in display here though. The clothes that I remember seeing her in was white shorts and like a white flowered top." He described with particularity the arrangement of furniture on Paul Main's porch on the day of the murder and the direction in which he and Paul Main were facing while sitting on the porch. He admitted that he had heard in 1980 that he and Paul Main had "a conflict in statements." He had, he recalled, told Paul Main on Sunday, June 6, 1982, that he and Paul had been sitting together on the front porch of Main's house on the day of the murder but that Paul Main had denied that. He did not recall telling the police when he was arrested that he had not been at Karla Brown's or Paul Main's house on the day of the killing. He denied having told Harold Pollard that the girl next door was dead or any details about the murder; he said, "I might have told him that there's a lot of cops around." He said he could not believe that he had told Harold Pollard he had seen the body over a policeman's shoulder. He described Harold Pollard as "confused." He denied, one by one, all of the incriminating statements attributed to him by Vickie and Mark White and Spencer Bond. He denied having made the statements attributed to him by Susan Lutz and denied having bitten her. He said that John Scroggins, whom he described as a friend, had lied when he said he had introduced the defendant to the victim the day before the murder. He denied that he had been advised of his constitutional rights at the time of his arrest.

The parties stipulated that certain information was published in two newspapers, the Alton Telegraph and the St. Louis Globe-Democrat. An article in the Alton Telegraph on June 22, 1978, stated that the victim was found in the utility room in the basement of her home at about 5:30 p.m. An article on June 24, 1978, stated that the victim's body was found "partially stuffed in a barrel of water in the basement of her Wood River home" and that "[t]he body had been stuffed from the head to the waist in the barrel."

In rebuttal the State recalled Dr. Campbell, who testified that in his opinion the teeth of Joe Milazzo (or Malozo, as the name is variously spelled in the transcript of proceedings) could not, because of their spacing and the lack of abnormal breakage anywhere, have made the marks on the victim's shoulder. The witness said that there were "definitely" and "absolutely" human bite marks on the victim's body. He pointed out certain differences between the impressions of the defendant's teeth and those of Joe Seitz to show why Seitz' teeth could not have made the wounds in question. The witness explained that the angle of the camera accounted for the linear pattern observed in some of the photographs; as the camera angle becomes obtuse, distortion of arch contour occurs. The witness testified that, of the teeth he had studied in the case, only those of the defendant could have made the mark on the victim's shoulder.

■ With respect to the first issue the defendant raises, he contends that the prosecution "totally failed to prove that he committed any act that caused the death of the victim" and that the State, therefore, failed to prove the criminal agency on the part of the defendant necessary to sustain a conviction. The State put on evidence concerning both the cause of the victim's death and the multiple injuries inflicted shortly before she died, including wounds resulting from having been bitten. For over two years after the murder occurred, no one who had examined the body or participated in the investigation of the case had any idea that bite marks were present on the body, and, when the body was found, the bite marks, which were located in the area of the victim's right shoulder, were covered by the socks tied around the neck and a buttoned sweater, seemingly put on the victim after the attack was begun and prior to her immersion. Nevertheless, within three days of the murder the defendant told friends, according to their testimony, that there were "teeth marks" on the body where the victim had been bitten and indicated that they were located in the area of the victim's shoulder. Furthermore, expert witnesses testified that the defendant's teeth, remarkable for their highly unusual spacing, could have made the bite marks

present on the victim's body. As early as about 6:30 or 7 p.m. on the day of the murder, within approximately an hour of the body's being found, the defendant had arrived at Harold Pollard's residence and while there informed him that the body had been found "curled up" with its hands tied behind its back, facts that were true but were not released to the public. According to Pollard, the defendant had accounted for his knowledge by saying that he had been able to view the body by looking over the shoulder of a policeman in the doorway or something to that effect, an act not possible according to the State's witnesses and a statement that the defendant essentially repudiated at trial. At the time the defendant talked of "teeth marks" on the body to Vickie White and Spencer Bond, he said as well, according to these witnesses, that the victim had been "tied up" was in a "curled" or "curled up" position. That the body was bound in any way does not appear in the newspaper articles published in the days following the murder and read into the record. Also absent from these articles is any statement that the body was "curled up" or in a "curled" position. That the body was "partially stuffed in a barrel of water" from the head to the waist does not necessarily imply or suggest that the body was "curled up." The testimony of Edna Vancil placed the defendant next door to the victim's residence shortly before and after the estimated time of the attack upon the victim as did some of the defendant's conflicting accounts of his whereabouts at that time. According to some of the defendant's accounts, on that day he was at the victim's residence as well. On the basis of the evidence presented, which we need not reiterate further here, the jury could have believed, and by its verdict plainly did believe, that the defendant not only had the opportunity to commit the crime but also was privy to information knowable only by one who had participated in the commission of it. Therefore, we must disagree with the defendant's contention that the State failed to prove beyond a reasonable doubt that he committed any act that caused the death of the victim and, thus, failed to prove criminal agency on his part.

■ With regard to the second issue the defendant presents for review concerning IPI Criminal 2d No. 3.02, the jury was read the part of that instruction which states:

> "Circumstantial evidence is the proof of facts or circumstances which give rise to a reasonable inference of other facts which tend to show the guilt or innocence of the defendant. Circumstantial evidence should be considered by you together with all the other evidence in the case in arriving at your verdict."

The second paragraph of the instruction, which the defendant apparently refers to as the "bracketed" material, was not read to the jury. That paragraph states, "You should not find the defendant guilty unless the facts or circumstances proved exclude every reasonable theory of innocence." As the State points out and the defendant concedes, the defendant stated at trial that he had no objection to the giving of the People's instruction No. 7, which did not include the second paragraph of IPI Criminal 2d No. 3.02. The defendant submitted only one instruction, having to do with evidence of the defendant's reputation for being a peaceful and law-abiding citizen. He did not address the omission in his post-trial motion or at the hearing on that motion but raises the issue for the first time on appeal.

In *People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331, the supreme court stated that its cases hold that failure to make an objection at trial to an error in jury instructions waives the issue for appeal, the reason for the waiver rule being that timely objections to defective instructions permit the court to correct the defects before the instructions are given and do not, therefore, permit a party failing to object to gain the advantage of obtaining a reversal based upon his own failure to act. The waiver rule is now, however, absolute and does not apply, as the court said in *Roberts*, to substantial defects in instructions if the interests of justice require, as provided by Supreme Court Rule 451(c) (87 Ill. 2d R. 451(c)). In sum:

> "[W]here there is a failure to object to an instruction, waiver is the rule, and the provision of our Rule 451(c) constitutes an exception which, under the prior decisions of this court, is a limited exception (*People v. Underwood* (1978), 72 Ill. 2d 124, 129-30), to be used to correct 'grave errors' (*People v. Jenkins* (1977), 69 Ill. 2d 61, 66), or to be applied where the case is close factually and fundamental fairness requires that the jury be properly instructed (*People v. Joyner* (1972), 50 Ill. 2d 302, 307).
>
> In discussing exceptions to the waiver rule as it relates to the failure to raise an issue in the trial court, this court stated in *People v. Burson* (1957), 11 Ill. 2d 360, 370, that the rule 'will not operate to deprive an accused of his constitutional rights of due process.' The court also stated that it may as a *matter of grace*, take notice of errors appearing upon the record *which deprived the accused of substantial means of enjoying a fair and impartial trial.* (11 Ill. 2d 360, 370-71.) In *People v. Pickett* (1973), 54 Ill. 2d 280, 283, this court noted that the plain error exception to the waiver rule will also be applied in

criminal cases in which the *evidence is closely balanced.*" (Emphasis in original.) *People v. Roberts* (1979), 75 Ill. 2d 1, 14, 387 N.E.2d 331, 337.

The defendant relies, in part, upon *People v. Crow* (1985), 108 Ill. 2d 520, 485 N.E.2d 381, in which the trial court refused to give the material omitted here. In *Crow* the court concluded that, when the evidence in a case is entirely circumstantial, juries should continue to be instructed in the language of the second paragraph of IPI Criminal 2d No. 3.02. The court found that the failure to give the second paragraph of the instruction was not harmless since, having considered the evidence, it could not say that the verdict would not have been different had that paragraph of the instruction been given. In *Crow*, however, waiver was not in issue. Hence, we find *Crow* inapposite to the case at bar.

■ In his reply brief the defendant argues that the instant case is a factually close one and, for that reason, the waiver rule ought not to apply. Our review of the evidence, however, which we have already stated at great length, leads us to the conclusion that such is not the case and that, consequently, the omission of the second paragraph of the instruction did not deprive the accused of substantial means of enjoying a fair and impartial trial. Therefore, we hold that this issue is waived for review.

■ In the third issue that the defendant asks us to consider on review, he maintains that his prior extrajudicial statements were erroneously used as substantive evidence rather than for the limited purpose of impeachment. Although the State asserts correctly that the issue was not raised in the defendant's written post-trial motion or at the hearing thereon and is, therefore, waived (*People v. Friesland* (1985), 109 Ill. 2d 369, 488 N.E.2d 261), we nevertheless elect to consider the issue because of the bearing the defendant's extrajudicial statements had upon the evidence in this case.

The cases upon which the defendant relies, namely, *People v. Bailey* (1975), 60 Ill. 2d 37, 322 N.E.2d 804, *People v. Collins* (1971), 49 Ill. 2d 179, 274 N.E.2d 77, *People v. Newman* (1964), 30 Ill. 2d 419, 197 N.E.2d 12, and *People v. Fields* (1975), 31 Ill. App. 3d 458, 334 N.E.2d 752, involved the prior inconsistent statements of witnesses other than defendants rather than the statements of defendants themselves. Any and every statement by an accused person, insofar as it is not excluded by the doctrine of confessions, or by the privilege against self-incrimination, is usable against him as an admission. (*People v. Garcia* (1981), 95 Ill. App. 3d 792, 420 N.E.2d 482; *People v. Howell* (1977), 53 Ill. App. 3d 465, 368 N.E.2d 689.) An admission is

any statement or conduct by a defendant which, when considered with other facts in evidence, permits an inference of guilt of the offense charged. (*People v. Burns* (1981), 99 Ill. App. 3d 42, 424 N.E.2d 1298.) Where an admission is proffered against a defendant, it is always admissible as substantive evidence for the purpose of showing guilt. (*People v. Burns* (1981), 99 Ill. App. 3d 42, 424 N.E.2d 1298.) For these reasons the defendant's prior statements, used as admissions, were properly admitted as substantive evidence.

▬ Concerning the fourth issue the defendant raises on appeal, he contends that conduct of the prosecutor at trial "compounded the aforementioned error," which we have held not to be error, "and resulted only in inflaming the jury." The defendant urges numerous instances of alleged error on the part of the prosecutor during the course of the lengthy trial, many of which, as the State points out, were waived for failure of the defendant to object to them when they occurred. We have, nevertheless, examined all of the instances of alleged error and find that in view of the nature and the extent of the evidence any error was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

▬ In the fifth issue the defendant raises for review, he asserts, as we have said, that expert testimony for the State concerning bite marks should not have been permitted because of "its exclusionary nature and its improper conclusiveness of the guilt of the defendant." However, at no time prior to appeal did the defendant raise this issue. He did not object to the testimony of the State's experts who testified in this regard and did not raise the issue in his written post-trial motion. In fact, he himself called experts to testify about the same matters. Even if consideration of the issue were not waived for review, nothing in the record indicates that the trial court abused its discretion in allowing expert testimony concerning bite marks to aid comparison between the wounds on the victim's right shoulder and the dentition of the defendant, the weight of such testimony being determined by the jury as trier of fact. See *People v. Milone* (1976), 43 Ill. App. 3d 385, 356 N.E.2d 1350.

▬ With respect to the sixth issue the defendant raises, he argues that his motion for change of venue should have been allowed because the State's admitted use of publicity about the case by the press as an investigative tool was "intended to create a public atmosphere of interest and suspicion." On May 10, 1983, prior to trial in June, a hearing was held on the defendant's motion for change of venue. Following arguments of counsel the trial judge stated in mak-

ing his ruling:

"I feel that the Motion for Change of Place of trial is more properly raised at that time that jury is being selected. I think only then will the Court be able to make any determination as to whether or not there are reasonable grounds to believe that there is such prejudice in actual existence that the Court reasonably apprehends that the Defendant can't receive a fair and impartial trial.

For that reason the Court will deny the Motion for Change of Place of Trial at this time but grant the Defendant the right to raise that motion again during jury selection should he so desire.

So Motion for Change of Venue as it is entitled is denied with leave to refile it at the time of jury selection, and I have so noted on the face of the motion itself."

The record indicates that *voir dire* commenced on June 20, 1983, and continued each day until it was concluded on June 23, 1983. According to the State in its brief, the *voir dire* examination was not transcribed, and the record for review contains no transcript of it. A transcript of a "Hearing on Motions," dated June 20, June 23, and June 24, 1983, shows that after the *voir dire* examination was concluded the trial court stated, "On the renewed motion for change of venue, that motion will be denied." No other reference to the motion is included in the record.

It is the duty of the appellant to provide a complete record on appeal, and the judgment entered by the trial court is entitled to every presumption in favor of its validity when the record is incomplete. (*People v. Butler* (1976), 41 Ill. App. 3d 750, 354 N.E.2d 568.) In the absence of a transcript of the *voir dire* examination, it is impossible for us to review the issue presented because of its factual nature. However, in the record that we do have, there is nothing to suggest that a jury anything less than fair and impartial heard and rendered a verdict in the defendant's case or that the trial court erred in denying the defendant's motion for a change of venue.

■ As we have indicated above, the defendant in his reply brief raises for the first time the issue of the denial of effective assistance of counsel to him at trial, saying:

"The State argues, as it has throughout its Brief, that even assuming the Defendant's contentions are correct, that most of these errors were waived by the Defendant as a result of the defense counsel's failure to object during trial or to raise the issue in a post-trial motion. With some reluctance, the Defend-

ant concedes that in those instances referred to by the State, the defense counsel did not object or raise the issue in a post-trial motion. In addition, the failure of defense counsel to object resulted in substantial prejudice to the Defendant without which the result of the trial would probably have been different."

The State relied upon *People v. Accardo* (1985), 139 Ill. App. 3d 813, 487 N.E.2d 664, where, as here, the defendant sought to circumvent the rule of waiver by raising for the first time in his reply brief the argument that he had received ineffective assistance of counsel because of counsel's failure to preserve the issue adequately in the proceedings in the trial court. As the court stated in *Accardo*, citing Supreme Court Rule 341(e)(7) (87 Ill. 2d R. 341(e)(7)), an argument not raised in the initial brief is deemed waived for purposes of review, although issues first raised in a reply brief may be addressed if a just result dictates consideration of all the issues. The court in *Accardo* concluded that the ineffective-assistance-of-counsel argument first advanced in defendant's reply brief was not "confined strictly to replying to arguments presented in the brief of the appellee," as required by Supreme Court Rule 341(g) (87 Ill. 2d R. 341(g)). The *Accardo* court concluded further that, under the circumstances of the case, the rule of waiver should not be relaxed, observing:

"Defendant's reply brief responds neither factually nor legally to the State's argument in its brief that a waiver occurred. Instead, the reply brief raises an entirely new issue, not claimed in the initial brief, to evade the State's waiver argument. Defendant could have anticipated the State's waiver argument. Were we to allow defendant to raise the effective assistance of counsel argument for the first time in his reply brief, the State will not have had the opportunity to respond." (*People v. Accardo* (1985), 139 Ill. App. 3d 813, 817, 487 N.E.2d 664, 667.)

The court declined to address the defendant's argument of ineffective assistance of counsel.

We find the situation presented in the instant case virtually indistinguishable from that presented in *Accardo* and adopt its reasoning. Unlike the argument of the defendant in *People v. George* (1986), 140 Ill. App. 3d 1001, 489 N.E.2d 1111, upon which the instant defendant relies, the argument advanced here is not, we think, an appropriate "repl[y] to arguments presented in the brief of the appellee." In *George* the defendant claimed in his initial brief that he had been convicted of felony theft improperly and in his reply brief that trial coun-

sel had been incompetent for eliciting the value of the items he was convicted of possessing, thus proving the State's case where the State had failed to do so. In its brief the State had responded that the issue was one of variance only. There was no attempt by the defendant in *George* to circumvent the rule of waiver. In the instant case, as in *Accardo*, the defendant could have anticipated the State's argument of waiver and raised the issue of ineffective assistance of counsel in his initial brief, thereby providing the State with an opportunity to respond. For these reasons we grant the State's motion to strike those portions of the defendant's brief addressing the issue of the denial of effective counsel to him, and we do not consider the issue.

Affirmed.

KASSERMAN, P.J., and WELCH, J., concur.