THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DWIGHT WEST, Defendant-Appellant.

Fifth District   No. 5—92—0875

Opinion filed July 12, 1994.

Harold K. Pike III, of Centralia, and James J. Gomric, of James J. Gomric, P.C., of Belleville, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn Kaplan, Solicitor General, and Terence M. Madsen and Kathy Shepard, Assistant Attorneys General, of counsel), for the People.

PRESIDING JUSTICE LEWIS delivered the opinion of the court:

Defendant, Dwight West, appeals his convictions by a jury for the offenses of arson (720 ILCS 5/20—1 (West 1992)) and aggravated arson (720 ILCS 5/20—1.1 (West 1992)). On appeal, defendant contends (1) that the State's expert witness should not have been allowed to testify as an expert on the cause and origin of the fire either (a) as a matter of public policy or (b) since the expert's investigation was done in contravention of the Private Detective, Private Alarm, and Private Security Act of 1983 (225 ILCS 445/1 *et seq.* (West 1992)); (2) that the court abused its discretion when it denied defendant's motion for directed verdict at the close of the State's evidence; (3) that the court abused its discretion when it replaced a juror with an alternate juror on the second day of trial; and (4) that the court erred when it allowed two State exhibits into evidence. For the reasons set forth below, we reverse and remand for a new trial.

Defendant owned and operated a retail business known as Fash-N-Fab, in which he sold vacuum cleaners, ceiling fans, sewing machines, craft items, and fabrics. Defendant also serviced and sold parts for vacuum cleaners and sewing machines. On August 8, 1990, Fash-N-Fab occupied three separate buildings located at 1485 West

Broadway, Centralia, Illinois. The front building or northernmost building was a display area (the display building), the middle building contained the office and a work area (the office building), and the southernmost building was a warehouse (the warehouse). The display building was connected to the office building by two passageways, while the office building was connected to the warehouse by one passageway. Defendant left the premises for the day on August 8, 1990, at about 5:30 p.m., shortly after which, at 5:37 p.m., a fire at Fash-N-Fab was reported to the Centralia fire department. The Centralia fire department responded within minutes of the report of the fire. Defendant filed a claim against his insurance carrier, State Farm Insurance Company (State Farm), for his loss. Because of the size of the loss, State Farm investigated the fire, and the investigator working for State Farm determined that the cause of defendant's fire was arson. Subsequently, the State brought five counts of arson and one count of aggravated arson against defendant.

The primary dispute in this case is over the trial judge's denial of the defendant's motion to disqualify John Walker, the State's expert witness, from testifying, because Walker was not licensed to investigate the cause and origin of fire for monetary gain. (225 ILCS 445/2(h)(4), 4 (West 1992).) We will summarize the testimony of Walker and two of the defendant's expert witnesses, because it assists in elucidating the reason why the legislature requires licensing of investigators of the causes and origins of fires.

Walker testified that he was employed by Barker and Herbert Analytical Labs (Barker and Herbert) of New Haven, Indiana, and that he investigates causes and origins of fires. He stated that he has a degree in nursing technology and an associate degree in fire science and is working on a bachelor's degree in fire and safety engineering and another degree in mechanical engineering, but he had no four-year degree at the time of trial. Further, he stated that he had attended approximately 1,000 hours in specialized training related to fire investigation, and that he had investigated over 2,000 fires. Upon *voir dire* by defense counsel, Walker admitted that he was not licensed as a fire investigator in the State of Illinois. Defendant objected to Walker testifying as an expert witness because he was not a licensed investigator as required by statute. (225 ILCS 445/2, 4(h)(2) (West 1992).) The court noted that it was clear that Walker's actions were contrary to the statute, but the court determined that a person need not be licensed to qualify as an expert. The court then allowed Walker to testify as an expert witness.

Walker testified that he was hired by State Farm to investigate the Fash-N-Fab fire to determine its cause and origin. He first learned

about the fire on August 10, 1990, but he did not go to the fire scene until the following Monday, August 13, 1990. Walker started his investigation by walking around the exterior of the buildings and then walking through the interior. He explained that he looked at the method of construction and the materials present inside the building. Walker found that there was a similar degree of extensive destruction in the office and display buildings, but that there was less destruction in the warehouse. However, Walker stated that the fire burned hotter in the north and west half of the display building. Walker found that the fire at Fash-N-Fab was hot and intense, and that it burned in multiple portions of the building very early, which he found unusual. Walker noted that the smoke from the fire was quite black, indicating that there were petroleum products inside, which was also unusual. Walker acknowledged that the carpeting in the office and display buildings and the tile flooring under the carpeting in the office building may have contributed to the black smoke, but he stated that neither was enough to create the degree of black smoke present. In Walker's opinion, the fire in the loft area of the warehouse appeared to be an isolated area of intense burning, indicating a separate fire origin.

Walker discussed the burn patterns of fires, stating that accelerant burn patterns are different from natural burn patterns. Walker found the burn patterns of the carpeting to be irregular, which indicated that there was intense floor-level burning. He stated this was the type of pattern found when an accelerant was "sploshed" onto the carpeting. He also stated that the floor-level burning was demonstrated by the burn patterns on the round display tables, which showed more burning on the underside of the tables than the top.

In contrast, however, Walker testified that the charring on the display frames in the display building was more intense on the upper portions than near the floor, and that there was no floor-level burning in the warehouse.

Walker took four samples to test for accelerants from the office building. In three of the samples, no accelerant or accelerant residue was found. He did not have the fourth sample tested even though he could smell a hydrocarbon substance (a flammable liquid) in it. He did not have this sample tested because:

"Just because you find accelerant residue in a fire is not necessarily indicative that that was the accelerant that was used. *** [I]n this example, or in this case, because this was a repair area where there could possibly have been some cleaning solvents to clean oil or grease from a sewing machine or vacuum cleaner motor or something."

According to Walker, the reasons why an accelerant residue may not be found in a sample were that some of the accelerants are water soluble and may be washed away when the firemen extinguish the fire with water; that the accelerant was completely consumed in a hot fire; that the accelerant was prone to evaporation; or that the sample was taken from the wrong place.

Walker explained that fire typically burns up, not down, and that if a fire burns down, it may be due to an unusual direction of air, such as from a fan, or it may be that a fuel accelerated the burning. He cited a couple of instances where the fire burned downward at Fash-N-Fab. Walker also stated that the fire began in more than one area at the same time, which indicated the use of a liquid accelerant. Walker ruled out careless smoking, the electrical wiring, the natural gas heater, and the furnace as possible causes of the fire. Walker concluded that the fire in the display building was caused by the use of an accelerant, probably three to five gallons of a heavier accelerant, like kerosene or diesel fuel.

On cross-examination, Walker stated that he believed the fire burned less than 15 minutes, based upon a videotape of the fire made by William Kracht. (William Kracht had previously testified that he videotaped only 26 minutes of the fire over the course of about two hours, and Centralia Fire Chief Richard Sutherland had testified that the fire department had pumped water on the fire for 45 minutes to an hour after arriving, and that after the fire was out, they went through the buildings and "mopped up" by putting out the hot spots.) Walker found no container for an accelerant at the scene of the fire (there was no evidence that the defendant had a container when he was seen leaving and locking up the building shortly before the fire.) Walker agreed that there was an accumulation of hot gases in the warehouse, and that when the door was opened, the gases hitting the air would burst into flames. This was evidenced by the flames coming out of the overhead door of the warehouse. The ignition point of these gases ranged from 600 to 1,500 degrees. Walker admitted that paper goods, such as those stored in the loft area of the warehouse, would ignite at 450 to 500 degrees.

The State, of course, presented a number of other witnesses, some of which testified about what they observed at the fire, while others testified about the defendant's finances. The State Fire Marshall did not testify or even participate in the investigation. The defendant also called numerous witnesses to testify, but his two main experts were Dr. Joseph Barbay and Rodney Bell, whose testimony will be summarized and compared with John Walker's testimony.

Dr. Joseph Barbay testified that he is an electrical engineer and

that he teaches at Southern Illinois University at Carbondale. He also works with Rodney Bell by doing lab work associated with electrical problems and fire investigations. He received and examined electrical panels and a ceiling fan removed by Bruce West (defendant's son) from the fire scene on May 12, 1992. Barbay did not find any abnormal damage to the electrical panels, but he found "something of interest" outside the panels. He stated: "There was the wire, which was apparently older wire, that has the cloth covering on it and then a new wire—which is a number 12—and a smaller wire and they were spliced and covered with black tape. And, this was apparently somewhere outside this box and not inside any type of electrical box. And, this is a violation of the national electric code." He noted that it is these types of areas where a fire could typically start. He also found that a number 12 wire, which can carry 20 amperes, was spliced to a number 14 wire, which can carry only 15 amperes. He explained that the splicing does nothing, but that if these wires are breakered at a higher ampacity and the current is drawn by something in the circuit, the lesser wire will be used beyond its safe ability to conduct current and will have a tendency to overheat.

In the other electrical panel, Dr. Barbay found that the neutral was broken. The break in the neutral had a sharp edge, which indicates that it was a mechanical break and not a break caused by melting in the fire. He explained that the neutral's function was to maintain the electrical division of a 240-volt circuit into two separate 120-volt circuits. When the neutral is broken, the balance of the system is undeterminable and can have up to double the voltage. He stated that this is definitely a substantial electrical problem.

Dr. Barbay found faulting in the wiring, which can cause "arcing" on the electrical wires. He stated that arcing could cause temperatures of 2,000 to 6,000 degrees and would ignite nearby combustible materials.

Dr. Barbay also examined the ceiling fan. His testimony about this exhibit revealed that its aluminum windings, which will melt at 1,240 degrees, were melted inside the ceiling fan, but that the copper windings inside, which would melt at 1,987 degrees, were not melted. However, copper splatterings were on the shroud of the fan, indicating that copper wiring above the fan melted due to arcing in the electrical wiring. This indicated to Dr. Barbay that the arcing took place in the copper wiring in the ceiling above the fan and that this is where the fire began.

On cross-examination, Dr. Barbay agreed that the flame tips from an accelerant fire would reach a temperature of 2,200 to 2,500

degrees, sufficient to melt copper. However, Dr. Barbay reiterated that the copper windings below the melted copper wiring were not melted, which reinforced his opinion that the fire was electrical and had originated above the ceiling fan.

Rodney Bell testified as defendant's primary expert witness. He has been involved in investigating fires for almost 40 years and has three degrees, a bachelor's degree in electrical engineering and bachelor's and master's degrees in industrial technology. He investigated accidents involving fuel or of a hydraulic or electrical nature for the United States Air Force for a number of years. He also taught at Southern Illinois University School of Technology for nine years.

Bell explained that the National Fire Protection Association publishes pamphlets regarding fire investigations. Bell stated that eyewitness testimony is critical in an investigation, and that procurement of such is one of the first things that should be done. (Walker had not interviewed any of the witnesses to the fire.) In addition, electrical and gas sources should be checked. Bell conducted an investigation in 1992 of the Fash-N-Fab fire. His investigation consisted of reviewing videotapes of the fire, performing some lab tests, and his observations. His company also examined several items removed from the fire scene. Bell determined from photographs of sewing machines taken at the fire scene that the fire damage to the machines indicated that the heat came from above the machines rather than below. He explained that plastic generates black smoke, and that polystyrene, an insulation used in these buildings, is a plastic product.

He also testified that the traffic patterns on the carpeting would create the clean burn patterns found at Fash-N-Fab. He explained that in the heavy traffic areas the carpeting would be worn more and would burn faster, allowing a deeper burn. He also explained that currents of air change burn patterns, and that, in fires, air currents are constantly changing. An exhibit of a test conducted by Bell revealed that the carpeting disintegrated as heat increases, without any flames. The heat applied to the carpeting disintegrated the carpeting at 701 degrees. Bell also noted that pegboard on the bottom of some of the display cases was unburned. He stated that this would have been burned had the fire been at floor level. He also explained why the round display tables were burned more on the bottom than on the top. This burning on the bottom of the tables was due to the undersides of the tables being made of chip cord (sawdust and glue), which would readily burn, while the tops of the tables were Formica, a fire-retardant material. Bell testified that the fuel load inside the defendant's buildings was exceptionally high.

Bell was aware that two separate tests of samples were run on gas chromatographs, which he indicated should have disclosed an accelerant if one was used. He also testified that, generally, kerosene can be smelled after a fire, and that since everything was not burned to the ground in this fire, a person should have been able to smell something at the fire scene. None of the witnesses called by the State smelled kerosene.

It was Bell's opinion that there were not three separate origins of fire. He stated that the "twinkling" testified to by another witness indicated that this was a smoldering fire. Bell stated that this same witness' testimony indicated that the evidence was more of a flash fire, where the fire flashes through the area once air has hit it.

Bell also corroborated Barbay's testimony that a smaller-size electrical wire spliced to a larger electrical wire would get very hot if a faulting occurred and would inflame the insulation on the wiring, which probably occurred in the ceiling of the office building. In addition, the fire would spread, due to the dust in the ceiling, the polystyrene insulation, and the plastics. He found four number 10, solid-copper conductors fused together, which he indicated had to be an arcing place in the electrical wiring. It was his opinion that the fire at Fash-N-Fab was an electrical fire which originated in the ceiling of the office building.

Bell also explained that the burn patterns from the fire in the loft area of the warehouse were a result of the oxygen-seeking fire. He stated that an open scuttle hole provided a source of air for the fire, causing it to burn down and making corresponding burn patterns.

On cross-examination, Bell testified that he is a certified fire investigator and that he has done a lot of work for State Farm. He admitted that when there is a hot fire, it is possible for the accelerant and its residue to burn up, but he stated that it generally does not.

At the close of the evidence, the jury found defendant guilty of five counts of arson and one count of aggravated arson. The court subsequently sentenced defendant to four years' incarceration on one count of arson and a concurrent sentence of six years' incarceration for the aggravated arson conviction.

We have set forth a comparative recitation of the testimony of the experts in order to show how close the question of guilt was. We will never know exactly why the jury returned a verdict of guilty, but the scales may have been tipped by the fact that the defendant did not testify, even though he had no prior criminal record. We can only speculate that the silence of the defendant left many questions that were not answered, especially about his financial problems, and

most likely allowed many inferences to be made by the jury that might not have been made if the defendant had testified. Further, the State's witnesses explained their reasons better than the defense witnesses due to the manner of cross- and direct examination by defense counsel.

We have already indicated that in Illinois anyone who investigates the causes and origins of fires must be licensed under the statute. (225 ILCS 445/2, 4 (West 1992).) Thus, defendant contends that the trial court abused its discretion by allowing an unlicensed person to testify as an expert in the case at bar. Defendant's second issue is related to this issue, *i.e.*, that Walker's investigation was conducted in contravention of the statute; therefore, his testimony about the cause and origin of the fire should not have been allowed. This issue appears to be one of first impression in Illinois. We agree with defendant with some exceptions.

■ Generally, to qualify a witness as an expert, it must be shown that the witness' experience and qualifications afford him knowledge which is not common to lay persons, and the testimony must aid the trier of fact in reaching a conclusion. (*People v. Enis* (1990), 139 Ill. 2d 264, 564 N.E.2d 1155.) It is the proponent of the testimony who has the burden of establishing the qualifications of the alleged expert witness, in this case, the State. (*People v. Park* (1978), 72 Ill. 2d 203, 380 N.E.2d 795.) Whether the proponent has met its burden is a matter within the sound discretion of the court, and only if the court abused its discretion will its determination be overturned on review. (*Park*, 72 Ill. 2d 203, 380 N.E.2d 795.) Here, we find that the court abused its discretion when it allowed the State's witness, John Walker, to testify as an expert witness, because he was not licensed as a private detective, as that term is defined in the statute.

Walker admitted that he was not a licensed investigator in Illinois. The legislature, in its wisdom, has enacted for the protection of the public the requirement that any person who investigates the causes and origins of fires for monetary gain must be licensed in order to conduct an investigation of this nature. (225 ILCS 445/2(h)(4), 3, 4 (West 1992).) The legislature has also set forth the minimum requirements for licensure in the statute. (225 ILCS 445/14 (West 1992).) In addition, the legislature has also determined that a person practicing as a private detective in Illinois without a license is guilty of a Class 4 felony. (225 ILCS 445/29 (West 1992).) Because of these provisions in the statute, it is clear that the legislature felt strongly that a person conducting arson investigations for hire, as opposed to those investigations conducted by local or State authorities, must be licensed by the State in order to ensure that the investigation was

conducted in a qualified, unbiased, and proper manner. Because of this legislation, the courts cannot ignore the licensing requirement in qualifying a witness as an expert, particularly where such conduct by the witness could subject the witness to criminal prosecution. In fact, if it is established that a person has been or is practicing in violation of the law, the court can enjoin that person from such further activity and summarily try and punish the offender for contempt of court, if the person violates the injunction. (225 ILCS 445/4 (West 1992).) By allowing Walker to testify, the State and the court were permitting a continuation of a commission of a crime that should have been enjoined. There may be rare occasions when the State may legitimately rely upon or allow a witness to commit a felony in order to obtain evidence against a defendant, but there was no need to do so in this case where the State Fire Marshall, firemen, police, and licensed "private detectives" were available.

There is no legislative history that specifically sets forth the reason for the enactment in 1983 of this legislation, effective January 5, 1984, requiring an investigator of the causes and origins of fires to be licensed. However, it is more than coincidental that on April 13, 1983, our supreme court decided *People v. Cornille* (1983), 95 Ill. 2d 497, 448 N.E.2d 857, and the Private Detective, Private Alarm, and Private Security Act of 1983 was amended soon afterwards. In *Cornille*, the supreme court reversed the defendant's arson conviction and remanded his case for a new trial because it was found that the expert witness for the State had lied about his qualifications. It was noted in the opinion that a newspaper reporter obtained an admission from the State's expert witness, who had been hired by an insurance company to investigate suspected arsons, that the expert had given false testimony about his qualifications in several arson cases. The publication of this admission and the subsequent uproar caused the authorities to investigate the State's expert witness with the result that perjury charges were filed in Boone, Cook, and Williamson Counties.

The facts in the case at bar are almost the same as in *Cornille*, except that in the case at bar Walker admitted that he did not have a degree or the requisite training, whereas the "expert" in *Cornille* lied about his educational background. In this case, as the State argues, it is clear that Walker had experience and training that exceeded that of the normal lay person in determining the cause and origin of a fire. Indeed, this is a complex area, as was demonstrated by the conflicting testimony of the expert witnesses on this same matter. Although Walker may have had extensive experience, it is also a requirement under the law that an expert have the requisite

statutory qualifications. These Walker did not possess, as even the court acknowledged when he noted that Walker was not in compliance with the statute. Nevertheless, the court allowed Walker to testify as an expert witness.

The State argues that the witness was unbiased, but we find that, under the circumstances here, the witness had every motivation to find that the fire at Fash-N-Fab was an arson fire. The witness worked for a company which was hired by State Farm to investigate the fire. It was entirely in State Farm's best interest that the fire be deemed arson, since this would relieve it of paying a large claim loss. Further, to have defendant convicted of the arson would bolster State Farm's denial of the claim in a civil lawsuit, should one be brought. One could conclude that State Farm would be very happy with the work of Barker and Herbert, if it did not have to pay the fire loss. We are not suggesting bad motives by Walker or State Farm but are merely pointing out that Walker is no *deus ex machina*, whose believability should not be scrutinized.

We note that by our holding we are not prohibiting witnesses from testifying as experts if the experts were not engaged as "private detectives" and simply were conducting tests within their field of expertise that may be used in trials. We see nothing to indicate that the legislature intended for all chemists, engineers, physicists, and architects, or any other experts that do lab work on items that may have been involved in fires, accidents, or injuries to real or personal property, to be licensed "private detectives" before they would be allowed to examine, test, and testify about the design, structure, and composition of the items.

The problem in the instant case is that the expert was actually practicing or conducting the primary investigation. The licensing provision of the statute enables the State to maintain some control over who practices, how an investigation is conducted, and what the minimum requirements should be if the investigation is conducted in Illinois.

We determine that the trial court abused its discretion in allowing Walker to testify as an expert witness as to the cause and origin of the fire, and his testimony should have been barred. In addition, his investigation cannot be considered, as it was conducted in violation of the law. We determine that defendant's convictions should be reversed, and this cause should be remanded for a new trial. This is particularly so since the evidence in this case was extremely closely balanced and Walker's testimony had to be pivotal in defendant's conviction.

Even though we are reversing and remanding this case for a new

trial, there are other issues raised by defendant that we must consider. One of the issues to be considered is whether the court erred in allowing defendant's recorded statement and the transcription of the statement made to Martha Hazelrigg, a claims representative for State Farm, into evidence, as this issue may be raised on retrial. This presents a troubling question.

Both sides rely on the same case, *People v. Prante* (1986), 147 Ill. App. 3d 1039, 498 N.E.2d 889, to support their positions. In *Prante*, this court discussed prior statements made by a defendant and stated the law as follows:

"Any and every statement by an accused person, insofar as it is not excluded by the doctrine of confessions, or by the privilege against self-incrimination, is usable against him as an admission. [Citation.] An admission is any statement or conduct by a defendant which, when considered with other facts in evidence, permits an inference of guilt of the offense charged. [Citation.] Where an admission is proffered against a defendant, it is always admissible as substantive evidence for the purpose of showing guilt." (*Prante*, 147 Ill. App. 3d at 1061-62, 498 N.E.2d at 904.)

The State argues that the statement made by defendant to Hazelrigg is admissible as an admission as that term is defined in *Prante* because the statements were relevant to defendant's financial motive, intent, and opportunity to commit the offense of arson. The defendant argues that the statement was not admissible as an admission as it does not permit an inference of guilt of the offense charged, when considered with other facts. Both arguments have merit.

■ The problem is that the whole statement of defendant was admitted into evidence, and the State never explained which portions of the statement were admissions pointing to defendant's guilt. A review of the statement reveals that a large portion of the statement contained irrelevant and what may or may not have been innocuous statements, depending on the biases and prejudices of each juror. Such statements as defendant's wife's maiden name, her age, etc. were clearly irrelevant. The State should have redacted those portions of the statement it believed to be admissible, so that only relevant admissions were presented to the jury.

The defendant's argument that a juror should not have been replaced with an alternate juror on the second day of trial need not be considered given our posture on the first issue discussed, as this issue may not arise on retrial.

■ The final issue to be considered is whether the trial court abused its discretion by not granting a motion for a directed verdict which was made at the close of the State's evidence and renewed at

the close of the case. We note that in *Cornille*, the supreme court remanded the case for a new trial even though there would have been insufficient evidence to convict without the testimony of the deceitful expert. (*Cornille*, 95 Ill. 2d 497, 448 N.E.2d 857.) Here, Walker's testimony, in addition to the other testimony presented by the State, when taken in the light most favorable to the State, was sufficient to allow the jury to reasonably conclude that defendant was guilty beyond a reasonable doubt. The fact that there were inconsistencies, contradictions, and discrepancies in the State's case does not mean that the trial court must cease viewing the evidence most favorably for the State or must cease considering all of the evidence that might indicate the guilt of the defendant. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

For the foregoing reasons, the judgment of the circuit court of Clinton County is reversed, and this cause is remanded for a new trial.

Reversed and remanded.

CHAPMAN and MAAG, JJ., concur.