# Illinois Official Reports

## Appellate Court

---

### *People v. Prante*, 2021 IL App (5th) 200074

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN PRANTE, Defendant-Appellant. |
| District & No. | Fifth District<br>No. 5-20-0074 |
| Filed | April 12, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Madison County, No. 82-CF-381; the Hon. Neil T. Schroeder, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Joshua Tepfer and Lindsay Hagy, of the Exoneration Project at the University of Chicago Law School, of Chicago, and Dana M. Delger (*pro hac vice*), of Innocence Project, Inc., of New York, New York, for appellant. |
| | Thomas D. Gibbons, State's Attorney, of Edwardsville (Patrick Delfino, Patrick D. Daly, and Julia Kaye Wykoff, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CATES delivered the judgment of the court, with opinion.<br>Justices Moore and Wharton concurred in the judgment and opinion. |

**OPINION**

¶ 1    The petitioner, John N. Prante, appeals from an order of the circuit court of Madison County, denying him leave to file a successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). The successive petition brought five claims: (1) that new scientific evidence regarding memory science, and the invalidity and unreliability of bite mark evidence demonstrates that he is actually innocent of the crime; (2) his constitutional right to due process of law was violated at trial by the State's use of faulty and since-repudiated forensic science on bite mark comparisons; (3) ineffective assistance of counsel of trial counsel, including for failing to challenge the admission of the State's evidence regarding bite marks and bite mark comparisons; (4) ineffective assistance of counsel of appellate counsel for failing to raise trial counsel's ineffectiveness; and (5) cumulative error. The circuit court denied the motion for leave to file the successive postconviction petition. For the reasons that follow, we reverse the judgment of the circuit court.

¶ 2                                    I. BACKGROUND

¶ 3    Following a three-week jury trial in June and July of 1983, the petitioner was convicted of the June 21, 1978, murder of Karla Brown. The petitioner was sentenced to the Department of Corrections for an extended term of 75 years. The facts of this case were set forth extensively in the petitioner's direct appeal. The evidence, as relevant to the case currently before us, is as follows.

¶ 4    On June 20, 1978, Karla Brown and her boyfriend, Mark Fair, moved into a home they recently purchased at 979 Acton Avenue, Wood River, Illinois. That evening, Fair and Brown, with the assistance of several friends, moved some of their belongings into the home. Paul Main, a friend of the petitioner, lived next door at 989 Acton Avenue. The petitioner and John Scroggins were visiting Main while Brown and Fair moved in next door. Scroggins, who knew both Brown and the petitioner, testified that he introduced Brown to the petitioner, who expressed a sexual interest in Brown.

¶ 5    At 7:45 a.m. the following morning, June 21, 1978, Fair left for work, leaving Brown alone in her new home. Brown spoke to Helen Fair, Fair's mother, on the phone between 10 a.m. and 11 a.m. The conversation was interrupted when Brown said she would have to call Helen back because "someone [was] at the door."

¶ 6    At approximately 10:45 a.m., Edna Moses was driving her grandson, Eric Moses, to the dentist, when she pulled into the driveway at Brown's home to turn her vehicle around. Edna and Eric saw a woman, matching the description of the victim, standing in the driveway talking to a man. Eric testified the woman "sort of got mad at [the man]." Edna testified that as she was turning around, the woman started to walk toward the house. At 11 a.m., a friend of Brown paid a visit to the home. Brown's van was at the house, but no one answered either the front or back door. Phone calls made to Brown's house between 11:45 a.m. and 2:30 p.m. went unanswered.

¶ 7    Around 4:30 p.m., Fair left work and drove to Tom Fiegenbaum's house. The men used Fiegenbaum's truck to pick up additional items from Fair's prior home to bring to the new house. When they arrived at the Acton Avenue house, Fair used his key to enter the front door, while Fiegenbaum backed his truck into the driveway. Fair went through the house to the back

door, which was unlocked, to help unload the truck. After the truck was unloaded, Fair invited Fiegenbaum inside to show him the house. The men entered through the back door, and Fair led Fiegenbaum into the basement. When Fair got to the foot of the stairs, he saw blood on the floor. Fair then noticed that the room was in disarray and there was blood all over the couch. Fair glanced into the laundry room and found Brown's body. Brown was bent at the waist over the side of a large metal lard can, with her head and shoulders submerged in water. Brown's hands were tied behind her back with a white extension cord from which the ends had been cut. Brown was nude from the waist down but was wearing a winter sweater that had been buttoned at the top. Fair pulled Brown's stiffened body from the can and laid her on the floor while Fiegenbaum called the police. Brown had large gashes on her forehead, chin, and nose. Two men's socks, tied together, were tied tightly around her neck. The area where the socks had been tied around her neck was bruised.

¶ 8        Police arrived and secured the crime scene. Fair told police that the men's socks had been kept in a dresser drawer in the bedroom upstairs and the extension cord had been packed in a box in the basement. The clothes that had been stored in the lard can had been dumped onto the floor and a stand of television trays had been overturned. A couch in the basement was soaked with blood, and blood was splattered on the basement floor. The bloodied couch cushion was saturated with water. On the coffee table near the couch was a bloodstained tampon. A coffee pot from the coffee maker in the kitchen upstairs, which police believed had been handled by the perpetrator, was found in the rafters of the laundry room. The scene was processed for fingerprints. All of the fingerprints recovered matched the victim, except for one, which was recovered from the coffee pot. This print did not match the petitioner and has not been matched to anyone else.

¶ 9        Pathologist Dr. Harry Parks conducted an autopsy on June 22, 1978, and concluded that Brown died from strangulation and that her facial injuries were caused by a blunt object. Dr. Parks estimated the time of death as 11:45 a.m. but believed this time could vary by as much as two to three hours.

¶ 10        Two witnesses testified that they saw the petitioner at Main's home on the day of the murder. Edna Vancil, who lived across the street from the residences of the victim and Main, testified that the petitioner arrived at Main's home between 9:30 and 10 a.m. on the day of the murder. Vancil testified that the petitioner and Main sat on the front porch of Main's home until approximately 11 a.m., when the two men "disappeared." Vancil stated that the men reappeared at noon and sat on the front porch until 3 p.m., when the petitioner left in his vehicle. Charles Nonn, a police officer for the City of Wood River, responded to the scene at about 6:20 p.m. Nonn testified he had known the petitioner for several years and that he saw the petitioner and Main standing in Main's front yard when he arrived.

¶ 11        Three days after the murder, on June 24, 1978, Ralph Skinner, the chief of police for the City of Wood River, interviewed the petitioner at his home. Skinner testified that the petitioner indicated he was at Main's house the evening before the murder while Brown and Fair moved in. The petitioner stated that on the day of the murder he dropped off an application at the Shell Oil Company in Roxana, Illinois, at approximately 8:15 a.m. The petitioner stated he arrived at Main's house at about 8:30 a.m. to see if Main would like to go to St. Louis to pick up employment applications while the petitioner dropped some off. The petitioner stated that Main was busy painting a neighbor's house, so the petitioner dropped off the applications alone. Skinner testified that the petitioner indicated he had "bummed around" afterward and was

unsure of where he stopped until he saw Main again at approximately 6 p.m. at Harold Pollard's house. The petitioner advised Skinner that he learned of the murder at that time, when Main told him that the girl next door had been killed.

¶ 12     Two weeks after the murder, on July 5, 1978, Eldon McEuen, an officer for the Wood River Police Department, interviewed the petitioner regarding the investigation. While reviewing the reports, McEuen noticed a discrepancy between the information provided by Main and the petitioner. McEuen testified that the petitioner reiterated that he had stopped at Main's house after dropping off his application at Shell Oil Company and then left to drop off additional applications alone because Main was busy painting a home nearby. McEuen testified that he asked the petitioner if he returned to Main's house afterward, and the petitioner indicated "he wasn't sure if he did or didn't." McEuen testified that the petitioner was unable to account for some of his time and stated the next thing he remembered was seeing Main at Harold Pollard's home when Main advised him about the murder.

¶ 13     In the summer of 1980, investigators sent photographs of the crime scene to Dr. Homer Campbell of the University of New Mexico. Dr. Campbell indicated that he believed certain marks, in the area of the victim's right collarbone, were bite marks. Prior to this time, no one who had examined the body or worked on the case had identified these marks as bite marks. In the spring of 1982, the police sought the assistance of the Federal Bureau of Investigation to develop a psychological profile of the perpetrator. As a result of this collaboration, the police decided to exhume Brown's body and sought to increase the media exposure regarding the crime. Articles appeared in regional newspapers about the impending exhumation, the existence of bite marks on the body, and technological advances in forensic science since the time of the murder.

¶ 14     On June 1, 1982, Brown's body was exhumed. The following day, Dr. Mary Case performed a second autopsy. Dr. Case opined that the cause of death was drowning based on crime scene photos showing the presence of foam around the victim's nose. Dr. Case believed the victim had been sexually assaulted. Dr. Case testified that "bite marks" in the area of the right collarbone had been inflicted at about the time of death because microscopic slides of that tissue showed fresh hemorrhage in the subcutaneous tissue with no inflammation.

¶ 15     At trial, the State presented the testimony of several witnesses, suggesting the petitioner knew certain details about the crime before they were publicized in the media. Harold Pollard testified that the petitioner arrived at Pollard's house around 6:30 or 7 p.m. on the day of the murder. Pollard stated that the petitioner seemed agitated or anxious and asked Pollard for a tranquilizer. The petitioner said that he had been at Main's house most of the day, smoking pot and drinking beer. The petitioner indicated that he had just left Main's house and that the girl living next door had been killed. Pollard testified that he asked the petitioner how he knew this, and the petitioner stated that "he got a glimpse of the girl by looking over the policeman's shoulder at the crime scene." Pollard testified the petitioner indicated "that the body was found curled up on the floor with its hands tied behind its back." Pollard testified that Main arrived at Pollard's house a short time later. Pollard stated that a day or two earlier, the petitioner had expressed sexual interest in the "nice looking blond chick [that] had moved in next door."

¶ 16     Vickie White testified that she had known the petitioner for about eight years. She stated that not more than three days after the murder, she and her husband, Mark, were visiting the home of Spencer and Roxanne Bond. The group was in the kitchen when the petitioner arrived and began to discuss Brown's murder. Mrs. White testified that the petitioner indicated he had

known the victim from college. Mrs. White also testified that the petitioner "had stated that she was murdered and that her body was down in the basement, and she was in a curled up position, and she had teeth marks on her body." Mrs. White testified that when the petitioner made the comment about the teeth marks, the petitioner "put his arm over his shoulder." Mrs. White stated that the petitioner indicated that he had been at Brown's residence on the day of the murder, that he had spoken with the victim, and that he "had to get his story straight with Paul Main." Mrs. White testified that the petitioner stated that Brown was "alright" when he left her house that day and that he was supposed to go back to her house later that day. Mrs. White first reported the petitioner's statements to the police on June 1, 1982. Mrs. White testified that she did not appreciate the significance of this conversation until she read the newspaper articles concerning the exhumation and the bite marks on Brown's body.

¶ 17    Mark White testified that within three days of the murder, the petitioner brought up the subject of Brown's murder while they were in the Bonds' kitchen. Mr. White testified that the petitioner stated he knew Brown, that he had been over to Brown's house talking to her on the day of the murder, and that he was supposed to return to her home that day. Mr. White testified the petitioner stated that he was afraid that he was the last person to see Brown alive and that he expected to be questioned by the police.

¶ 18    Roxanne Bond testified that she had known the petitioner for eight or nine years and that the petitioner had been a good friend of the Bonds. Mrs. Bond testified that she did not hear much of the conversation in her home on the evening in question because she was frequently outside with her child. Mrs. Bond testified that she did hear the petitioner state that he "had to get his story straight."

¶ 19    Spencer Bond testified that he had known the petitioner for 9 or 10 years and that he usually saw the petitioner once a day around the time of the murder. Mr. Bond testified that he first heard about Brown's murder from the petitioner on the Friday night following the murder. Mr. Bond stated that he and the Whites were in the kitchen of his home when the petitioner arrived. Mr. Bond testified that the petitioner stated he had been at Main's house the day of the murder, and that he had spoken to Brown at her house around 2 or 3 p.m. The petitioner indicated that he was supposed to go back to Brown's house that day because the petitioner might have a date with her. Mr. Bond testified that the petitioner stated that the victim had been tied up and "was in a curled position stuck in a pail of water down in the basement." Mr. Bond testified that the petitioner stated that the victim "had teeth marks on her shoulder where she had been bitten on her left shoulder," gesturing as he made the statement. Mr. Bond stated that the petitioner indicated that he had put in a few work applications, and that he and Main had been getting drunk and high at Main's house that day. The petitioner indicated that he and Main "had to get their stories together as to what they were doing that day" because they did not want to give conflicting statements to the police. Mr. Bond testified that he did not realize the significance of the petitioner's statements when they were made and that he first told police about the statements on June 1, 1982, when the police came to talk to him. Mr. Bond indicated he had not talked to Vickie or Mark White prior to his interview with police.

¶ 20    On June 2, 1982, Mr. Bond participated in a wiretap of the petitioner conducted by police. In the first taped conversation, the petitioner stated that he and Main were getting drunk and high at Main's home on the day of the murder and that they had seen the victim "putterin' around outside" that day. The petitioner stated that he did not even know that the murder had occurred until he read about it in the newspaper a few days later.

¶ 21    On June 4, 1982, police officers went to the petitioner's home to obtain his cooperation in making dental impressions of his teeth. On the way to the dentist's office, the petitioner initiated a conversation with the officers. The petitioner stated that he was drinking wine on Main's front porch on the day of the murder and that he was there when the police arrived at Brown's house. The petitioner also asked the officers whether Spencer Bond was working with the police.

¶ 22    Later on June 4, 1982, Mr. Bond participated in a second wiretapped conversation with the petitioner. During this conversation, the petitioner stated that he was at Main's house from approximately 10 or 11 a.m. until sometime between 4 and 7 p.m. on the day of the murder. The petitioner stated that he was drinking wine and smoking pot on Main's porch, and that he and Main had left the house a few times to get more alcohol. The petitioner stated that he saw Fair arrive home that day, as well as the police, the ambulance, and the coroner. In this conversation, the petitioner denied ever being at the victim's home but acknowledged that he may have spoken to her in the driveway.

¶ 23    The State also presented the testimony of Susan Lutz, who had met the petitioner in 1980 or 1981 and had dated the petitioner for a while. Lutz testified that once, when they were in bed, the petitioner "kind of whispered in my ear that he had killed a woman." When Lutz questioned the petitioner about it the next day, the petitioner stated he killed the woman because he was "mad" but that he "can't really talk about it because I'll lose my freedom." Lutz testified that the petitioner had bitten her on the neck a couple of times.

¶ 24    On June 8, 1982, investigators took the dental impressions of the petitioner, Paul Main, and another suspect named Joe Seitz to Dr. Lowell Levine in New York. Agent Randy Rushing testified that Dr. Levine compared the dental impression with photographs of Brown's body and eliminated Seitz and Main as suspects. On June 8, 1982, the petitioner was arrested. The police seized two white electrical cords with no male or female ends from the petitioner's vehicle.

¶ 25    Dr. Campbell, an expert in forensic odontology and photographic enhancement, explained that forensic odontology, as a science, involved the identification of deceased individuals through dental records, injury assessments, and the analysis of bite mark injury patterns. Dr. Campbell was a member of the American Academy of Forensic Sciences, the American Society of Forensic Odontology, and the American Board of Forensic Odontology (the Board). The Board was created in 1976 after the American Academy of Forensic Sciences was requested to sponsor a certification program "to bring the standards [of forensic odontology] up to a par." The Board was the certifying body for forensic odontologists, which required new members to take an examination in order to become certified. Dr. Campbell testified that a practitioner should have some knowledge about each area of forensic odontology, but that it was not necessary for a practitioner "to be an expert in each and every field" in order to become certified. Dr. Campbell testified that he was Board-certified, indicating that he had been "grandfathered in." Dr. Campbell explained that during the Board's first two years, all forensic odontologists that met certain threshold requirements—including an unspecified number of years practicing, cases performed, and autopsies attended—were automatically given Board certification in forensic dentistry.

¶ 26    Dr. Campbell testified that a bite mark examination requires the examiner to first determine whether the injury in question was a human bite mark. Dr. Campbell testified that a human bite mark is ovoid in shape and that frequently only the front six teeth will mark. A bite mark

comparison requires the examiner to compare the "class characteristics" and the "individual characteristics" of the teeth to the mark. Class characteristics are "general characteristics" present in everyone, such as the arch or curvature, general spacing between the teeth, and the general size and shape of the teeth. For example, the central incisors or upper front teeth are usually wider, the lateral incisors are narrower, and the eye teeth or canines are more pointed. The central and lateral incisors on the lower jaw are generally the same size as each other, and there is an eye tooth or canine on each side. Individual characteristics are fillings, breakage of teeth, the placement of the teeth in the mouth, wear patterns, and angles.

¶ 27    Bite mark injuries are usually preserved photographically. Dr. Campbell indicated that it would be ideal for the injury identification if it was photographed at a 90-degree angle, and with a ruler or scale, so the examiner could establish a "true life size" image to use for comparison. Dr. Campbell testified that the Board was working on developing standards but that there were currently no published standards as to how bite mark evidence must be preserved in order to make a comparison. Dr. Campbell also testified there was no published standard governing when an evaluation could be rendered by an examiner. Dr. Campbell stated that the accepted standard in the field of forensic odontology for making an evaluation was dependent on the individual case and the knowledge and experience of the examiner.

¶ 28    In autopsy photographs of the victim, Dr. Campbell testified he saw two or three human bite marks overlapping each other on the right side of the victim's neck just above the collarbone. Dr. Campbell stated that the photos were not taken to document the "bite mark" injuries, noting that, in one photograph, the victim's skin was wrinkled from its positioning and that, in another, the victim's chin was being "lifted." Dr. Campbell acknowledged that in one of the "cropped" or enlarged photographs, the alleged bite mark appeared to be a straight line instead of a curve, which he explained was a result of the camera angle and the positioning of the body, both of which can cause distortions of the injury in photographs.

¶ 29    Dr. Campbell compared molds of teeth from three suspects—the petitioner, Paul Main, and Joe Seitz—to the photographs of the victim's injuries. Dr. Campbell testified that the mold of the petitioner's teeth showed he had a space between each of his six upper front teeth, which Dr. Campbell described as an "anomaly." Dr. Campbell indicated that the cropped and enlarged photograph, in which the "bite mark" was seen as a straight line, showed "a wide tooth, and a wide tooth, and a more narrow tooth and a more narrow tooth with spacing in between the teeth." Dr. Campbell testified that, in his opinion, the petitioner's teeth were consistent with the victim's injury based on the presence of spaces between the six front teeth. Dr. Campbell explained that "consistent" means "those teeth could have made the bite mark, period." Dr. Campbell testified that there was nothing about the quality of the photographs of the injury that concerned him with regard to formulating his opinion that the petitioner's teeth were consistent with the injury.

¶ 30    During cross-examination, Dr. Campbell testified that "the technology or the methods for examining bite marks ha[d] changed dramatically in the last 8 years." Dr. Campbell testified that skin was a "very excellent" medium for recording bite marks and that any doctor "that's had much experience with bite mark injuries consider[s] it to be an excellent reproducer of tooth characteristics" capable of picking up "minute details." Dr. Campbell testified that he would "compare" dental impressions to fingerprints. When asked whether it was possible for more than one set of teeth to make the same mark, Campbell answered that "[e]verybody's dentition is individual," and asserted that, when individual characteristics are present, an

examiner can determine whether a specific person made the mark within a "very high degree" of dental certainty. Dr. Campbell defined a "reasonable degree of dental certainty" as meaning "a very high degree of probability that you would ever find another set of teeth that would make the same marks. I would say it would be virtually impossible."

¶ 31     Dr. Lowell Levine, who was qualified as an expert in forensic dentistry, testified that he was certified by the Board and was a fellow of the American Academy of Forensic Sciences. Dr. Levine testified that to identify an injury for a bite mark, the examiner would look for class characteristics such as whether the injury is an ovoid or semi-ovoid shape, the approximate size of the injury, and whether there is "patterning *** that could be from the shape of teeth."

¶ 32     Dr. Levine testified that the injury is typically photographed for comparison, and while there were no published standards for the identification of bite marks or the procedures to be followed, there were methods that were "generally accepted in the community." Dr. Levine stated that, ideally, the photographs of the injury will be taken at 90 degrees, or perpendicular to the arch, and with a rule of measure in place. Dr. Levine testified that a scale of measurement could be important because it can inform the examiner if the injury is "within the ballpark" of a human bite mark. Dr. Levine testified that having a life size scale of the bite was not "quite as important" as believed 8 to 10 years ago due to increased recognition of individual characteristics of a person's dentition and the skin's ability to "capture and reflect unique and individual characteristics with very good fidelity." Dr. Levine explained that the "technology and expertise" of bite mark analysis had changed dramatically over the last decade. Dr. Levine also testified that there were no published standards for analyzing bite mark evidence or for offering an opinion as to "common origin" and that an analysis was based only upon the training and expertise of the examiner. Dr. Levine testified that different people could not leave identical bite marks.

¶ 33     Dr. Levine opined, to a reasonable degree of medical certainty, that there were two or three overlapping bite marks visible in the autopsy photographs of the victim's body. Dr. Levine explained that a "reasonable medical certainty" means "a very, very high degree of probability." Dr. Levine testified that, in his opinion, to a reasonable degree of dental certainty, the petitioner could have caused the bite mark injuries on Brown. Dr. Levine based his opinion on the spaces between the patterns in the victim's injury and the presence of spaces between the petitioner's upper front teeth. Dr. Levine testified that his ability to make a comparison was not hindered by the fact that the photographs were not taken at a 90-degree angle.

¶ 34     The State also called Dr. Ronald Mullen, the petitioner's dentist, to testify. Dr. Mullen had been practicing as a dentist for 17 years and had treated approximately 6000 to 7000 patients. Dr. Mullen testified that the petitioner's upper teeth had spaces between them, a condition called diastemata. Dr. Mullen testified that he has seen this particular type of spacing in less than one percent of his patients, or less than 15 times over his career.

¶ 35     The petitioner called 17 witnesses at trial, including 3 experts to counter the State's bite mark experts. Dr. Donald Ore, a pediatric dentist who was qualified as an expert in photography, testified that there was no published standard procedure for photographing injuries for the purpose of making a bite mark comparison. Dr. Ore stated that the preferred standard among forensic odontologists would be to photograph the injury at a right angle without stretching the skin in any way, and with a millimeter scale present. Dr. Ore testified that two of the photographs in this case showed "an extreme amount of enlargement," the degree of which could not be determined due to the absence of a scale in the photograph. Dr.

Ore testified that enlarging a photograph to the point that it "exceeds the limits of resolution of the film" can distort the image.

¶ 36    The petitioner also called Dr. Edward Pavlec, an orthodontist and Board-certified forensic odontologist, qualified as an expert in forensic odontology. Dr. Pavlec testified that a committee of the American Academy of Forensic Sciences has issued temporary guidelines on the standard for processing bite mark evidence that were pending approval by the members. The American Society of Forensic Odontologists had also not yet accepted the proposed guidelines, and Dr. Pavlec acknowledged that a minority of examiners did not believe any written guidelines were necessary. Dr. Pavlec also acknowledged that the current "standard" was the "expertise" of the examiner.

¶ 37    Dr. Pavlec testified that proper preservation of bite mark evidence for comparison requires the photograph of the injury to include a standard form of measuring to determine the exact size of the wound. Dr. Pavlec expressed concern that the autopsy photographs were "dirty," meaning that the victim's wounds had not been cleaned and it was unclear whether some of the marks on Brown's body were injuries or dried blood. Dr. Pavlec was also concerned that one of the "bite marks" appeared as a straight line, which Dr. Pavlec testified could only occur if the tissue were stretched and distorted. Dr. Pavlec testified that stretching the skin and enlarging the photograph will make the spaces between the teeth looker larger. Dr. Pavlec described the autopsy photographs as being "one step above useless" for comparison purposes. Due to the lack of quality of the photographs, Dr. Pavlec found little evidence to substantiate a finding that the injury was a human bite mark at all.

¶ 38    Dr. Pavlec testified that the photographs of Brown's body showed a "bruise pattern" on the neck that "could be a bite mark" but that these marks also could have been caused by other trauma, such as through strangulation, or could have been left by jewelry or a heel. Dr. Pavlec testified that, assuming the injury was a bite mark, both the petitioner's teeth and Joe Seitz's teeth could have left the mark on Brown's shoulder. Dr. Pavlec estimated that up to 10% of the adult population had spaces between their teeth. Dr. Pavlec stated that a bite mark with spaces between the teeth could also be made by a person without spaces between their teeth due to the position, shape, and wearing of the person's teeth.

¶ 39    Dr. Norman Sperber, a dentist and Board-certified forensic odontologist, testified that he was a member of the American Academy of Forensic Scientists, the American Society of Forensic Odontology, and the Board. Dr. Sperber testified that forensic odontology was a forensic science, defined as "the types of sciences that use measurements [and] either chemical or physical constants," and which included ballistics, fingerprints, handwriting, forensic psychiatry, and forensic pathology.

¶ 40    Dr. Sperber was the chairman of the Board's Bite Marks Standard Committee, which was formed to determine the standards and guidelines to be applied in "proper[,] accurate scientific bite mark analysis and comparison." Dr. Sperber testified that the proposed guidelines have not yet been accepted by the members but that they have been "accepted as working rules for years." Dr. Sperber stated that the proposed guidelines direct that "standard" and "scientific" procedures be utilized in making comparisons. Dr. Sperber stated that the photograph of the bite mark should be taken at a right angle to prevent distortion and should include rulers or scales to ensure the photograph is in the same scale as the model of the suspect's teeth.

¶ 41    Dr. Sperber testified that the autopsy photographs in this case were "dirty," so it was difficult to differentiate between bloodstains and injuries. Dr. Sperber testified that he was not

sure that any of the victim's injuries were human bite marks and, if they were, the photographs were not suitable to make a bite mark comparison. Dr. Sperber testified that the photographs of Brown's body provided no "usable information" for bite mark identification because the body is bloodstained, the injuries are distorted by the camera angle, and they lack a rule of measurement.

¶ 42    Dr. Sperber rejected the proposition that the enlarged photograph showing a straight line of marks was a bite mark, since "it's just impossible because bite marks don't come out square and straight like that." Dr. Sperber testified that a person could say some of the marks "resemble bite marks" but that these marks could "resemble other things as well." Dr. Sperber stated that he would not make a determination that the marks on the victim's body were human bite marks based on the photographs.

¶ 43    The petitioner testified on his own behalf that he had "virtually no memory" of the day of the murder "but things have come together in this last year." The petitioner testified that on the day of the murder, to the best of his knowledge, he went to Main's home in the morning and then left to drop off job applications at several companies. The petitioner testified that he returned to Main's house at "about ten to twelve or one" and that he "sat around" with Main on Main's front porch. The petitioner testified that he has "this feeling" that he was there all day. The petitioner did not remember leaving the house but acknowledged that he or Main might have gone to the store during the day. The petitioner testified that he and Main saw the victim in her yard, but he denied speaking to her.

¶ 44    The petitioner stated that when the police arrived at Brown's house, he went inside Main's house before leaving shortly thereafter. The petitioner testified that it "keeps feeling right to say" he then went to Harold Pollard's home. The petitioner stated that it "stuck" in his mind that Main showed up at Pollard's home and explained what was happening at Brown's home. The petitioner testified the next time he heard about Brown's death was at Spencer Bond's house a few days or a week later.

¶ 45    The petitioner remembered talking to the police but said he had difficultly remembering what occurred on the day of the murder because he was confused and had memory problems. The petitioner denied biting Lutz or telling her that he ever killed anyone. The petitioner also denied making the statements to Pollard on the day of the murder and the statements attributed to him at the Bonds' home several days after the murder. The petitioner testified that Scroggins lied about introducing the petitioner to the victim the day before the murder.

¶ 46    After deliberation, the jury found the petitioner guilty of murder. The court sentenced the petitioner to an extended term of 75 years.

¶ 47    The petitioner appealed, arguing, among other things, that the State's expert testimony concerning bite marks should not have been admitted because of "its exclusionary nature and its improper conclusiveness of the guilt of the [petitioner]." This court affirmed, finding the issue was waived. *People v. Prante*, 147 Ill. App. 3d 1039, 1062 (1986). Alternatively, citing *People v. Milone*, 43 Ill. App. 3d 385 (1976), this court found that the record did not indicate that the trial court abused its discretion "in allowing expert testimony concerning bite marks to aid comparison between the wounds on the victim's right shoulder and the dentition of the [petitioner], the weight of such testimony being determined by the jury as trier of fact." *Prante*, 147 Ill. App. 3d at 1062.

¶ 48    On May 14, 1993, the petitioner filed a motion seeking DNA analysis on blood evidence from a couch cushion seized from the victim's home. On May 18, 1993, the petitioner filed a

postconviction petition alleging substantial denials of his constitutional rights, including the right to effective assistance of counsel. On July 15, 1993, the petitioner filed an amended postconviction petition. The State filed a motion to dismiss, which the circuit court granted. This court affirmed the circuit court's dismissal of the petitioner. *People v. Prante*, 275 Ill. App. 3d 1153 (1995) (table) (unpublished order under Illinois Supreme Court Rule 23). On January 30, 2002, the petitioner filed a petition for relief from judgment pursuant to section 2-1401(f) of the Code of Civil Procedure (735 ILCS 5/2-1401(f) (West 2002)), asserting that his sentence violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The State filed a motion to dismiss, which the circuit court granted.

¶ 49 On January 3, 2017, the petitioner filed a motion for postconviction DNA and fingerprint testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2016)), requesting DNA testing on several pieces of physical evidence from the victim's home and latent print testing to try to identify the unidentified fingerprint on the coffee pot. The State did not oppose the motion, and the circuit court entered agreed orders for the testing. The State was unable to locate Brown's rape kit, so this evidence was not tested. No interpretable DNA profiles were obtained from the testing on the remaining evidence. Fingerprint testing revealed usable prints from the coffee pot, but no new matches were made.

¶ 50 On October 15, 2018, the petitioner filed his motion for leave to file a successive postconviction petition, which is the subject of the current appeal before this court. The petitioner has raised five claims in his successive petition. The petitioner's primary contentions are that new scientific evidence regarding memory science and the invalidity and unreliability of bite mark evidence support his claims that he is actually innocent of the crime. Alternatively, the petitioner contends that his constitutional right to due process of law was violated at trial by the State's use of faulty and since-repudiated forensic science on bite mark comparisons. The petitioner also argues ineffective assistance of counsel for failing to raise or preserve issues related to the bite mark evidence, and cumulative error.

¶ 51 In support, the petitioner attached affidavits and other documents suggesting that the current scientific community recognizes a lack of consensus on whether forensic dentists have the ability to reliably identify injuries as human bite marks or to associate those bite marks with an individual. The petitioner attached two affidavits of Dr. Iain Pretty, a dental surgeon and forensic dentist. Dr. Pretty stated that recent research has shown that there is no scientific basis for stating that a particular injury can be associated with an individual's dentition, or for assigning a probability or statistical weight to an association. Dr. Pretty detailed a study, which demonstrated that Board-certified forensic dentists did not consistently agree on whether an injury was a human bite mark. Dr. Pretty averred that there were no studies, empirical experiments, or systematic reviews providing any objective metrics or assurances that the process of comparing injuries caused by teeth on human skin to molds of a suspect's dentition was reliable. Dr. Pretty stated that "bitemark analysis of any kind" was inherently unreliable and that poor quality evidence, like that presented in this case, "further undermine[d] what is a fundamentally unreliable and unsafe forensic technique."

¶ 52 The petitioner's documentation also included reports from the National Academy of Sciences, the Texas Forensic Science Commission, and the President's Council of Advisors on Science and Technology, indicating each of these organizations has examined bite mark evidence and found the evidence lacked a scientific basis. The National Academy of Science's 2009 report, *Strengthening Forensic Science in the United States: A Path Forward* (NAS

- 11 -

report), concluded that there was no scientific basis to support the proposition that a forensic odontologist, looking at a bite mark in human skin, could associate that mark to a potential biter. See Committee on Identifying the Needs of the Forensic Sci. Community, National Research Council, National Academy of Sci., Strengthening Forensic Science in the United States: A Path Forward (2009) [https://perma.cc/2PTA-F47C] (Strengthening Forensic Science). The NAS noted that the Board had approved guidelines for bite mark analysis but found that the guidelines did not indicate the criteria necessary for using each method to determine whether the bite mark could be related to an individual's dentition and with what degree of probability. The report concluded "[t]here is no science on the reproducibility of the different methods of analysis that lead to conclusions about the probability of a match." Strengthening Forensic Science, *supra*, at 174. The NAS reported that even when the Board's guidelines were followed, different experts provided widely differing findings and resulted in "a high percentage of false positive matches of bite marks using controlled comparison studies." Strengthening Forensic Science, *supra*, at 174. The NAS found that no thorough study had been conducted to establish the uniqueness of bite marks and there was no established science indicating what percentage of the population could have produced the bite. Strengthening Forensic Science, *supra*, at 174. The NAS report found there were disputes about (1) the accuracy of human skin as a reliable registration material for bite marks, (2) the uniqueness of the human dentition, (3) the techniques used for analysis, and (4) the role of examiner bias. Strengthening Forensic Science, *supra*, at 176. Despite the Board's development of guidelines, the NAS found "there is still no general agreement among practicing forensic odontologists about national or international standards for comparison." Strengthening Forensic Science, *supra*, at 176. The report found that "[a]lthough the majority of forensic odontologists are satisfied that bite marks can demonstrate sufficient detail for positive identification, no scientific studies support this assessment, and no large population studies have been conducted." Strengthening Forensic Science, *supra*, at 176.

¶ 53    The petitioner included the April 2016 report issued by the Texas Forensic Science Commission (TFSC) on forensic bite mark comparisons (Tex. Forensic Sci. Comm'n, Forensic Bitemark Comparison Complaint Filed by National Innocence Project on Behalf of Steven Mark Chaney—Final Report (2016), https://www.txcourts.gov/media/1440871/finalbitemark report.pdf [https://perma.cc/2ATJ-9Y6M] (Forensic Bitemark Comparison). The TFSC found that there was no scientific basis for stating that a particular patterned injury could be associated to an individual's dentition and that any testimony describing human dentition "like a fingerprint" lacked scientific support. Forensic Bitemark Comparison, *supra*, at 12. The TFSC stated there was no scientific basis for assigning a probability or statistical weight to an association. The TFSC concluded that the "overwhelming majority of existing research does not support the contention that bitemark comparison can be performed reliably and accurately from examiner to examiner due to the subjective nature of the analysis." Forensic Bitemark Comparison, *supra*, at 12. This conclusion was based, in part, upon the inability of Board-certified forensic odontologists to agree on the threshold question of whether a patterned injury constituted a human bite mark. Forensic Bitemark Comparison, *supra*, at 13. Some of the deficiencies found by the TFSC included that (1) there was significant disagreement among Board members about how to establish criteria for the identification of bite marks and how to test that criteria through research studies, (2) there was no system for outside auditing, (3) there was no systemic requirement for peer review or technical review, (4) there was no consistency

in the way analytical results were reported, and (5) there was no meaningful proficiency testing system. Forensic Bitemark Comparison, *supra*, at 14.

The petitioner also included the 2016 report issued by the President's Council of Advisors on Science and Technology (PCAST), titled *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods*. The PCAST report concluded

> "that bitemark analysis does not meet the scientific standards for foundational validity, and is far from meeting such standards. To the contrary, available scientific evidence strongly suggests that examiners cannot consistently agree on whether an injury is a human bitemark and cannot identify the source of bitemark with reasonable accuracy." President's Council of Advisors on Sci. & Tech., Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods 87 (2016), https://obama whitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_ science_report_final.pdf [https://perma.cc/83KV-Y2R7] (Forensic Science in Criminal Courts).

The report found that few empirical studies had been undertaken to determine the ability of examiners to accurately identify the source of a bite mark and that, in those studies which have been undertaken, "the observed false positive rates were so high that the method is clearly scientifically unreliable at present." Forensic Science in Criminal Courts, *supra*, at 87.

The circuit court denied the petitioner's motion for leave to file the successive postconviction petition on all grounds. With regard to the petitioner's actual innocence claims, the court found the new evidence regarding bite mark analysis was not of such a conclusive nature that it would probably change the result on retrial. The court also concluded that the petitioner's alleged "new evidence" regarding advances in memory science was not new and was cumulative of evidence and arguments already presented at trial. The court rejected the petitioner's due process claim, finding that recent developments in the field of bite mark analysis may constitute cause but that the petitioner was not prejudiced. The court found no prejudice because there was "a great deal of circumstantial evidence" other than the bite mark evidence that placed the petitioner at or near the crime scene, including the petitioner's own incriminating statements, and the jury may have disregarded the bite mark comparisons in light of the competing expert bite mark testimony. This appeal follows.

## II. ANALYSIS

The Act provides a statutory remedy to criminal defendants who claim a substantial violation of their constitutional rights occurred at trial. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act is not a substitute for an appeal, but instead offers a mechanism to assert a collateral attack on a final judgment. *People v. Robinson*, 2020 IL 123849, ¶ 42. Where a petitioner has previously taken an appeal from a judgment of conviction, the doctrine of *res judicata* bars the postconviction review of all issues decided by the reviewing court and any other claims that could have been presented to the reviewing court are deemed waived. *Edwards*, 2012 IL 111711, ¶ 21.

The Act only contemplates one postconviction proceeding. *Robinson*, 2020 IL 123849, ¶ 42. The bar against successive postconviction proceedings will be relaxed on two bases. *Robinson*, 2020 IL 123849, ¶ 42. The first is where the petitioner can establish cause and prejudice for the failure to assert a claim in an earlier proceeding. 725 ILCS 5/122-1(f) (West 2016); *Robinson*, 2020 IL 123849, ¶ 42. The second basis is when the petitioner can establish

a fundamental miscarriage of justice based on actual innocence. *Robinson*, 2020 IL 123849, ¶ 42. A petitioner must obtain leave of court before instituting a successive postconviction proceeding. *Robinson*, 2020 IL 123849, ¶ 43.

¶ 59    A request for leave to file a successive postconviction petition should be denied only where it is clear from a review of the petition and supporting documentation that the claims fail as a matter of law or where the petition and supporting documentation are insufficient to justify further proceedings. *People v. Smith*, 2014 IL 115946, ¶ 35. At the pleading stage, all well-pled allegations in the petition and supporting affidavits that are not positively refuted by the record must be taken as true. *Robinson*, 2020 IL 123849, ¶ 45. On appeal, this court reviews the sufficiency of the allegations in the postconviction petition, which is purely a legal question. *Robinson*, 2020 IL 123849, ¶ 39. Therefore, the circuit court's denial of a motion for leave to file a successive postconviction petition is subject to *de novo* review. *Robinson*, 2020 IL 123849, ¶ 39.

¶ 60                                    A. Cause and Prejudice

¶ 61    On appeal, the petitioner argues that the circuit court erred in denying him leave to file his successive postconviction petition because he established a *prima facie* claim of cause and prejudice based on new scientific evidence demonstrating the invalidity and unreliability of the bite mark evidence used by the State to obtain his conviction. Under the cause and prejudice prongs, the petitioner must establish "cause" by demonstrating that some objective factor external to his defense impeded his ability to raise the claim in an earlier proceeding. *People v. Pitsonbarger*, 205 Ill. 2d 444, 460 (2002). To establish "prejudice," the petitioner must demonstrate that the claimed constitutional error so infected his trial that the resulting conviction violated due process. *Pitsonbarger*, 205 Ill. 2d at 464. The petitioner must make a *prima facie* showing of both cause and prejudice as to the asserted claim or claims. *People v. Bailey*, 2017 IL 121450, ¶ 24.

¶ 62    The petitioner contends that his constitutional right to due process of law was violated by the State's use of faulty and unreliable bite mark evidence to obtain his conviction. At trial, the jury heard extensive competing expert testimony regarding the nature of the marks on the victim's right shoulder. The State's experts testified that these injuries were human bite marks and that they were consistent with the petitioner's dentition. The State's experts testified that every person's dentition is unique enough that it is possible, assuming a clear enough mark, to positively identify a specific individual as the "biter." The State also presented evidence that the spacing of the petitioner's teeth, the individual characteristic used by the experts to conclude that the petitioner's teeth were consistent with the marks on the victim's body, was found in as little as one percent of the population. At trial, the petitioner presented expert testimony that the quality of the photographs of the victim's injuries was too poor to make a determination whether the injuries were human bite marks.

¶ 63    On appeal, the petitioner argues that there has been a significant change within the scientific community with regard to bite mark evidence since his trial in 1983. The petitioner argues that while he was able to present some criticisms of the State's bite mark evidence through his own experts' testimony at trial, new evidence demonstrates that the scientific bases of bite mark analysis has been repudiated, such that the identification of injuries as bite marks and the identification of a perpetrator of a bite mark has been rejected by the scientific community. The petitioner asserts that bite mark analysis is no longer generally accepted in

- 14 -

the scientific community and the evidence could not meet the *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), standard for admissibility. In response, the State asserts that bite mark evidence is still admissible in Illinois, citing *Milone*, 43 Ill. App. 3d at 398, and *People v. Shaw*, 278 Ill. App. 3d 939, 948 (1996).

¶ 64    While the parties spar on the question of the admissibility of bite mark evidence in Illinois, they do so in very general terms. Neither party presents any substantive analysis on the current state of the law in Illinois regarding the admissibility of bite mark evidence, specifically, whether bite mark evidence is "scientific evidence" that is subject to the dictates of *Frye*.

¶ 65    "Illinois law is unequivocal: the exclusive test for the admission of expert testimony is governed by the standard first expressed in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)." *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 76-77 (2002), *overruled on other grounds by In re Commitment of Simons*, 213 Ill. 2d 523, 530-32 (2004) (adopting a dual standard of review for *Frye* rulings). The *Frye* standard, also known as the "general acceptance" test, "dictates that scientific evidence is only admissible at trial if the methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.' " *Donaldson*, 199 Ill. 2d at 77 (quoting *Frye*, 293 F. at 1014).

¶ 66    "General acceptance" does not apply to the expert's ultimate conclusion, but upon the underlying methodology used to generate the conclusion. *Donaldson*, 199 Ill. 2d at 77. "If the underlying method used to generate an expert's opinion [is] reasonably relied upon by the experts in the field, the fact finder may consider the opinion—despite the novelty of the conclusion rendered by the expert." *Donaldson*, 199 Ill. 2d at 77. "General acceptance" does not require universal acceptance of the methodology. *In re Commitment of Simons*, 213 Ill. 2d at 530. While general acceptance does not require that the methodology be accepted by unanimity, consensus, or even a majority of the experts, a technique cannot be "experimental or of dubious validity." *Donaldson*, 199 Ill. 2d at 78.

¶ 67    Under *Frye*, the trial court need not make a separate inquiry into the reliability of the methodology. *Donaldson*, 199 Ill. 2d at 81. The reliability of a methodology is naturally subsumed by the inquiry into whether the methodology is generally accepted in the scientific community because "a principle or technique is not generally accepted in the scientific community if it is by nature unreliable." *Donaldson*, 199 Ill. 2d at 81. "Questions concerning underlying data, and an expert's *application* of generally accepted techniques, go to the weight of the evidence, rather than its admissibility." (Emphasis in original.) *Donaldson*, 199 Ill. 2d at 81. "Trial judges decide the general acceptance of the technique; a jury decides whether it will accept the expert's conclusion which is based on the technique." *Donaldson*, 199 Ill. 2d at 82.

¶ 68    The *Frye* test applies only to a new or novel scientific methodology, which is described as one that is " 'original or striking' " or "does 'not resembl[e] something formerly known or used.' " *Donaldson*, 199 Ill. 2d at 78-79 (quoting Webster's Third New International Dictionary 1546 (1993)). "Once a principle, technique, or test has gained general acceptance in the particular scientific community, its general acceptance is presumed in subsequent litigation; the principle, technique, or test is established as a matter of law." *Donaldson*, 199 Ill. 2d at 79. The presumption of general acceptance in subsequent litigation, however, can be problematic. The courts have cautioned that "relying exclusively upon prior judicial decisions to establish general scientific acceptance can be a 'hollow ritual' if the underlying issue of

scientific acceptance has not been adequately litigated." (Internal quotation marks omitted.) *Donaldson*, 199 Ill. 2d at 84 (quoting *People v. Basler*, 193 Ill. 2d 545, 554 (2000)). In determining whether a *Frye* hearing is required and whether a scientific technique is generally accepted in the relevant scientific community, a reviewing court may rely upon appropriate sources outside of the record, including legal and scientific articles and opinions from other jurisdictions. *In re Commitment of Simons*, 213 Ill. 2d at 530-31.

¶ 69    Not all expert testimony, however, is subject to a *Frye* analysis. The dictates of *Frye* only apply to scientific evidence. *People v. McKown*, 226 Ill. 2d 245, 254 (2007). The line separating scientific and nonscientific evidence is not always clear. *People v. Coleman*, 2014 IL App (5th) 110274, ¶ 114. Whether a particular piece of evidence falls within the classification of "scientific" is an issue frequently litigated. See *McKown*, 226 Ill. 2d at 255 (discussing the split among jurisdictions on the question of whether horizontal gaze nystagmus testing is scientific); *In re Commitment of Simons*, 213 Ill. 2d at 533-35 (discussing the split among the jurisdictions on whether *Frye* is applicable to actuarial risk assessments); *In re Detention of New*, 2013 IL App (1st) 111556, ¶¶ 47-59 (analyzing whether the diagnosis of a novel mental disorder is subject to the general acceptance test under *Frye*); *Coleman*, 2014 IL App (5th) 110274, ¶¶ 111, 114 (finding testimony from an "expert linguist" on the issue of authorship attribution was not scientific evidence subject to *Frye* because the opinion was derived solely from the expert's observations and experiences). Scientific evidence "is the product of scientific tests or studies." *McKown*, 226 Ill. 2d at 254. Illinois courts require scientific evidence to meet the *Frye* standard because evidence labeled as "scientific" "carries a greater weight in the eyes of the jury, which may accord it undue significance because 'science' is equated with truth." *McKown*, 226 Ill. 2d at 254.

¶ 70    In support of its assertion that bite mark evidence is admissible in Illinois, the State cites *Milone*, 43 Ill. App. 3d at 398, and *Shaw*, 278 Ill. App. 3d at 948. *Milone*, 43 Ill. App. 3d 385, is the seminal case on the admission of bite mark evidence in Illinois. It is also the first reported case in Illinois to discuss the issues raised in *Frye*, 293 F. 1013. *Milone* involved a murder in which the victim was found with bite marks on her thigh. The trial court admitted the bite mark evidence offered by the State, which included three expert witnesses who asserted that the defendant was "without a doubt the perpetrator of the bite on the victim's thigh." *Milone*, 43 Ill. App. 3d at 392. The defendant presented four competing expert witnesses who concluded that there was no positive correlation between the defendant's dentition and the bite mark on the victim.[1] *Milone*, 43 Ill. App. 3d at 392. On appeal, the defendant contended that the State should have been precluded from introducing evidence identifying him as the perpetrator of the bite mark. *Milone*, 43 Ill. App. 3d at 394. The defendant argued that bite mark identification should not be admissible because, as a science, it had not gained general acceptance in the particular field in which it belonged, as required by *Frye*. *Milone*, 43 Ill. App. 3d at 394. The defendant also argued that the bite mark identification evidence failed to meet the "prior reliability" test utilized by the Illinois Supreme Court 65 years earlier in *People v. Jennings*,

_____

[1] Milone maintained his innocence even after his release from prison. See *Milone v. Camp*, 22 F.3d 693, 700 (7th Cir. 1994). In support of his federal *habeas* petition, Milone alleged that the mark on the victim's thigh was shown to match the dentition of a known serial killer, Richard Macek. *Milone*, 22 F.3d at 700-01. Milone also alleged that Macek confessed to the murder before committing suicide in 1987, although the parties disputed on whether Macek later recanted his confession. *Milone*, 22 F.3d at 701.

- 16 -

252 Ill. 534 (1911), in holding that fingerprint identification testimony was admissible. *Milone*, 43 Ill. App. 3d at 394. In affirming the trial court's admission of the evidence, the court discussed several decisions from other jurisdictions and ultimately rejected *Frye*'s application to bite mark evidence because it required only the direct observation of physical characteristics, as opposed to the "interpretation of mechanical measurements." *Milone*, 43 Ill. App. 3d at 396-98. The court found that:

> "[b]ite-mark comparison *** involves only a visual comparison between the wound and the dentition of the defendant. *** For this reason, the testimony of the experts serves only to lend assistance to the trial court in interpreting physical evidence not within the ken of the average trial judge's knowledge. There is no intermediate mechanical stage in which reliability may be questioned. Such evidence is more analogous to footprint, fingerprint, and hair, comparisons which are made for purposes of identification." *Milone*, 43 Ill. App. 3d at 396.

¶ 71　　The court also noted that evidence regarding the identification of a deceased person from dental records was admissible in Illinois. *Milone*, 43 Ill. App. 3d at 396-97. The court found that the "concept of identifying a suspect by matching his dentition to a bite mark found at the scene of a crime is a logical extension of the accepted principle that each person's dentition is unique." *Milone*, 43 Ill. App. 3d at 397.

¶ 72　　In the years following *Milone*, 43 Ill. App. 3d 385, the decision was cited as support for the admissibility of bite mark evidence, as well as other scientific evidence deemed only to involve a "visual comparison." As already noted, in the petitioner's direct appeal, this court cited *Milone*, 43 Ill. App. 3d 385, to summarily dispose of the petitioner's contention that the State's bite mark evidence should not have been admitted at trial. *Prante*, 147 Ill. App. 3d at 1062. Ten years later, in *Shaw*, 278 Ill. App. 3d at 948, *Milone* was cited for the proposition that expert testimony concerning bite mark identification was admissible in Illinois based on the "unique quality of an individual's dentition."

¶ 73　　In *People v. Columbo*, 118 Ill. App. 3d 882, 956 (1983), the defendant appealed the trial court's admission of testimony from a forensic anthropologist regarding handprint measurements as a means of identification. The appellate court affirmed the trial court's determination, finding the examination and comparison of the handprints was beyond the realm of common experience and was a proper subject for expert testimony. *Columbo*, 118 Ill. App. 3d at 956-57. The appellate court rejected the argument that *Frye* applied to "all scientific evidence," finding that *Jennings*, 252 Ill. 534, suggested that Illinois courts "adhered to [a] more liberal 'reliability test' " regarding the admission of scientific evidence. *Columbo*, 118 Ill. App. 3d at 957-60. Citing *Milone*, 43 Ill. App. 3d 385, the court held that the handprint comparison evidence was admissible because it involved only a "visual comparison" and "expert testimony regarding the results of a scientific process in which there are no intermediate mechanical stages is admissible once a competent expert testifies that the scientific process in question is reliable." *Columbo*, 118 Ill. App. 3d at 960.

¶ 74　　Further developments in the law, however, have eroded *Milone*'s holding that *Frye* is only applicable when the scientific evidence in question involves an "intermediate mechanical stage." See *Milone*, 43 Ill. App. 3d at 396. Although *Milone* has not been explicitly abrogated, at least one other court has recognized the fallacy of its holding. In *People v. Ferguson*, 172 Ill. App. 3d 1, 8-10 (1988), the trial court allowed the State to admit expert testimony on the identification of the suspect based on comparing "shoe wear patterns" on the theory that "wear

- 17 -

patterns" are unique and can be used to identify the person who wore a shoe. The *Ferguson* court observed that some Illinois cases, including *Milone*, did not apply the *Frye* test to determine the admissibility of scientific opinions because the courts "distinguished between scientific processes using an intermediate mechanical stage in which reliability may be questioned from those using only visual analysis such as footprint, fingerprint, and hair comparisons." *Ferguson*, 172 Ill. App. 3d at 10 (citing *Milone*, 43 Ill. App. 3d at 396, and *Columbo*, 118 Ill. App. 3d at 960). The *Ferguson* court rejected the lower standard applied in those cases, even though the instant case was also a visual analysis and found that the expert's "theory" that shoe wear patterns were unique was inadmissible under *Frye* because it was not generally accepted in the scientific community. *Ferguson*, 172 Ill. App. 3d at 10-12.

¶ 75    Some jurisdictions have held that bite mark analysis is not scientific evidence that must meet the *Frye* requirements for admission. See *Handley v. State*, 515 So. 2d 121, 129-32 (Ala. Crim. App. 1987) (finding *Frye* inapplicable when the expert evidence is in the nature of physical comparisons as opposed to scientific tests or experiments); *Commonwealth v. Cifizzari*, 492 N.E.2d 357, 362-64 (Mass. 1986) (finding *Frye* did not apply to bite mark evidence because the testimony merely aided the jury in making a visual comparison). Other jurisdictions have concluded that bite mark evidence is subject to *Frye*. See *People v. Marsh*, 441 N.W.2d 33, 35-36 (Mich. Ct. App. 1989) (bite mark evidence was admissible without conducting a *Frye* hearing because the scientific procedures used—such as X-rays, impressions, and photographs—were not novel); *State v. Hodgson*, 512 N.W.2d 95, 98 (Minn. 1994) (scientific bite mark analysis by a recognized expert is not novel under *Frye*); *State v. Sager*, 600 S.W.2d 541, 560-73 (Mo. Ct. App. 1980) (bite mark evidence was admissible under *Frye*); see also *People v. Middleton*, 429 N.E.2d 100, 103-04 (N.Y. 1981) (bite mark evidence is generally accepted as reliable because the techniques employed in rendering the opinion— such as photography, making dental molds, and visual observation—are accepted by majority of experts in the field).

¶ 76    We agree with the court's holding in *Ferguson* and reject *Milone*'s limited application of *Frye*. Today, in determining whether *Frye* applies, courts examine whether the expert's testimony is the "product of scientific tests or studies." See *McKown*, 226 Ill. 2d at 254. There is no requirement that the scientific methodology employed by the expert involve an "intermediate mechanical stage" for *Frye* to apply. We find that bite mark evidence is "scientific evidence" within the meaning of *Frye* because it purports to employ a scientific process requiring examination and analysis by an expert trained in interpreting the evidence.

¶ 77    Although bite mark evidence has been admitted into evidence in Illinois for more than 50 years, our survey of the law indicates that Illinois courts have never subjected bite mark evidence to the rigors of *Frye*. Instead, *Milone*, the first published opinion in Illinois to even discuss *Frye*, erroneously dismissed its application, which succeeding courts then relied upon when addressing the issue.

¶ 78    As already noted, under the cause and prejudice prongs, the petitioner must establish "cause" by demonstrating that some objective factor external to his defense impeded his ability to raise the claim in an earlier proceeding. *Pitsonbarger*, 205 Ill. 2d at 460. In this case, the defense did not challenge the admissibility of the State's expert testimony on bite marks at trial. The petitioner raised the issue on direct appeal, which this court found was waived and, alternatively, not error. *Prante*, 147 Ill. App. 3d at 1062. Thus, the petitioner's claim is barred by *res judicata*. *People v. Patterson*, 192 Ill. 2d 93, 139 (2000). In the interests of fundamental

fairness, however, the doctrine of *res judicata* can be relaxed if the petitioner presents substantial new evidence. *Patterson*, 192 Ill. 2d at 139.

¶ 79     Relying on *Milone*, this court summarily dismissed the petitioner's argument that the State's bite mark evidence should not have been admitted. *Prante*, 147 Ill. App. 3d at 1062. As evidenced by *Shaw*, 278 Ill. App. 3d at 948, issued in 1996, the courts were still relying on *Milone* in holding that bite mark evidence was admissible years after the petitioner filed his direct appeal and his initial postconviction petition. Furthermore, the successive postconviction petition and supporting affidavits and documents demonstrate that the examination as to the validity of bite mark evidence has occurred only in the past decade or so. Thus, even if the petitioner had previously successfully convinced a court to abrogate *Milone* and hold that *Frye* was applicable to bite mark evidence, the scientific community has only recently come to question the scientific foundation of this evidence. Based on the foregoing, we find that the petitioner has established cause for failing to raise his claim in an earlier proceeding.

¶ 80     We also find that the petitioner has made a *prima facie* showing of prejudice. Again, to establish "prejudice," the petitioner must demonstrate that the claimed constitutional error so infected his trial that the resulting conviction violated due process. *Pitsonbarger*, 205 Ill. 2d at 464.

¶ 81     As the factual background indicates, the State's case against the petitioner was largely circumstantial. The evidence indicated that the petitioner was near the scene of the crime and therefore had the opportunity to commit the crime. The petitioner also repeatedly changed his story and did not provide a reliable account of his whereabouts on the day of the murder. These facts alone, however, are far from sufficient proof of guilt. Instead, the only clear link between the petitioner and the crime was the testimony of the petitioner's friends that the petitioner disclosed certain details regarding the condition of the victim's body and the crime scene shortly after the murder, which only could have been known by the perpetrator.

¶ 82     Harold Pollard testified that the petitioner indicated, on the evening of the murder, that Brown was found with her hands tied behind her back.[2] The petitioner stated he obtained this information when "he got a glimpse of the girl by looking over the policeman's shoulder at the crime scene." The most incriminating statements, though, were those introduced through the testimony of Vickie White and Spencer Bond. White and Bond testified that several days after the murder, the petitioner told them that Brown had "teeth marks" on her body, specifically indicating the left shoulder area. Although the injuries in this case were located on Brown's right shoulder, the fact that no one identified these injuries as potential bite marks until years later was damning circumstantial evidence against the petitioner. During trial, the defense challenged the witnesses' memories, probing the possibility that the witnesses' memories were flawed or contaminated.

¶ 83     The petitioner's statements that the victim was bitten is why the State's bite mark evidence was material to the petitioner's conviction, even though the State's experts did not provide a positive identification of the petitioner as the "biter." In this case, the fact that the injury was definitively identified as a human bite mark by the State's expert witnesses was likely enough

---

[2]While much has been made of the petitioner's comment that the body was found "curled up" on the floor, the incriminating nature of this comment is questionable. The evidence was that Brown's murderer left her bent over the side of the lard can, which is not the same as being "curled up" on the floor.

to seal the petitioner's fate. The testimony of the State's expert witnesses that the petitioner's teeth were "consistent" with the mark further supported a finding that the petitioner was, in fact, the "biter" and that the petitioner did not learn about this injury on Brown's shoulder in some other way.

¶ 84    Above all, the State's expert testimony gave the impression that the testimony from the Whites and Bonds regarding the petitioner's statements was corroborated by scientific evidence. The persuasiveness of seemingly objective, truthful scientific evidence cannot be ignored or understated. The recognition that "scientific" evidence "carries a greater weight in the eyes of the jury" because it is "equated with truth" is precisely why Illinois courts require scientific evidence to meet the *Frye* standard. *McKown*, 226 Ill. 2d at 254.

¶ 85    During the petitioner's trial, the experts' bite mark testimony was frequently described as "scientific," with the experts touting recent advancements in bite mark "technology." While the experts acknowledged the absence of any published standards in collecting or evaluating the evidence, the necessity of such was dismissed. To the extent that the experts could be said to agree on standard processes, such as photographs being taken perpendicular to the injury with a scale present and no manipulation of the victim's skin, the State's experts asserted that adherence to the standards was not vital to rendering an opinion so long as the examiner was sufficiently experienced. Thus, the State's qualified experts concluded that the marks on the victim's body were, to a reasonable degree of dental certainty, human bite marks and that they were "consistent" with the petitioner's dentition, despite relying on admittedly visually distorted photographs of a poorly positioned body that had no scale, and which had been enlarged to unknown degree.

¶ 86    This court cannot say whether bite mark evidence would have passed a *Frye* examination in 1983; nor does this opinion purport to state whether it can today. That is not the question being asked of this court. Instead, the question is whether the petitioner's successive postconviction petition and supporting documentation, alleging cause and prejudice, fails as a matter of law.

¶ 87    Since the petitioner's trial, the law regarding the admissibility of scientific evidence has developed, to the extent that bite mark evidence would now be considered "scientific" evidence that must withstand a *Frye* analysis. Furthermore, the petition effectively alleges, and supports with documentation, a recent change within the scientific community regarding the validity and reliability of bite mark evidence, suggesting that the evidence presented by the State at the petitioner's trial is no longer generally accepted within the scientific community. We find that the petition made a *prima facie* showing of cause and prejudice and that the circuit court erred in denying the petitioner leave to file his successive postconviction petition on this basis.

¶ 88                               B. Actual Innocence

¶ 89    In his motion for leave to file his successive postconviction petition, the petitioner alleged the petition and exhibits present new, material, noncumulative, and conclusive evidence of the petitioner's innocence. Specifically, he argued that the petition and its exhibits present new evidence that the bite mark comparison evidence used against him at his 1983 trial was completely without scientific basis and unreliable and that new evidence on memory science casts doubt on the witness testimony against him.

¶ 90    In a successive postconviction petition, a petitioner's failure to raise a claim in an earlier petition will be excused to prevent a fundamental miscarriage of justice. *Pitsonbarger*, 205 Ill.

- 20 -

2d at 459. To demonstrate a fundamental miscarriage of justice, the petitioner "must show actual innocence." *Edwards*, 2012 IL 111711, ¶ 23. "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 91 Evidence is newly discovered if it is discovered after trial and the petitioner could not have discovered the evidence earlier through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47. Evidence is material if it is relevant and probative of the petitioner's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Noncumulative evidence is that which adds to the information that the fact finder heard at trial. *Robinson*, 2020 IL 123849, ¶ 47. Evidence is conclusive when the evidence, when considered along with the trial evidence, would probably lead to a different result. *Robinson*, 2020 IL 123849, ¶ 47. "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 92 "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48. The new evidence does not need to be entirely dispositive to find that it is likely to alter the result on retrial. *Robinson*, 2020 IL 123849, ¶ 48. The circuit court should only deny the petitioner's request for leave to file the successive postconviction petition when it is clear from a review of the successive petition and supporting documentation that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence. *Edwards*, 2012 IL 111711, ¶ 24. Leave of court should be granted when the petition "raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Robinson*, 2020 IL 123849, ¶ 44.

¶ 93 While we agree with the petitioner that the new evidence about the validity and reliability of bite mark evidence would constitute new, material, and noncumulative evidence, we do not believe the petitioner has demonstrated that the evidence is conclusive of his innocence.

¶ 94 On appeal, the petitioner has asserted that the State would be barred from presenting any evidence regarding bite marks on retrial. The petitioner suggests that even evidence akin to that presented by his trial experts, specifically that the injuries to the victim *could* have been caused by human teeth, would be inadmissible. The petitioner posits that if the State cannot present any evidence that the injuries could be bite marks, then any testimony that the petitioner claimed the victim's body had teeth marks on it was irrelevant and without value. We disagree.

¶ 95 The petitioner has presented compelling documentation undermining the scientific foundation of bite mark comparison evidence, including whether Board-certified forensic odontologists can reliably identify an injury as a human bite mark. The State, however, would still be entitled to present evidence as to the condition of the victim's body. It is possible that this could include evidence that there were marks on the victim's right shoulder that could *conceivably* have been made by human teeth.[3] There is a material distinction between the

---

[3]Notably, the NAS report acknowledged that "forensic odontologists understand the anatomy of teeth and the mechanics of biting and can retrieve sufficient information from bite marks on skin to assist in criminal investigations and provide testimony at criminal trials," even though there was no scientific basis for the conclusion that bite mark comparisons can result in a conclusive match. , *supra*, at 175.

State's expert testimony that the injury on the victim's right shoulder was positively a human bite mark and that this mark was consistent with the petitioner's dentition, versus the testimony of the petitioner's experts that the mark on the victim's body could have been caused by any number of conditions or objects, including human teeth. But as previously noted, we make no decision on the admissibility of this evidence, as it remains to be determined how the *Frye* analysis will determine the scope, if at all, of the admission of comparison testimony.

¶ 96 Nevertheless, while the petitioner has made a *prima facie* showing that the conclusive nature of the State's expert witnesses' testimony deprived him of his constitutional right to due process, he has not demonstrated that a lack of certainty as to the origin of the victim's injury "raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Robinson*, 2020 IL 123849, ¶ 44. This is especially true in light of Harold Pollard's testimony that the petitioner told Pollard on the evening of the murder that the petitioner knew the victim was found tied up in the basement. The State presented circumstantial evidence of the petitioner's guilt, even absent the State's expert testimony on bite mark analysis.

¶ 97 For these reasons, we find the petitioner has not presented a colorable claim of actual innocence, and the circuit court properly denied him leave to file a successive postconviction on this basis. In light of this court's finding as to the petitioner's cause and prejudice claim, we need not address the petitioner's alternative claims for relief.

¶ 98                                         III. CONCLUSION

¶ 99 For the foregoing reasons, the judgment of the circuit court of Madison County denying the petitioner's motion for leave to file a successive postconviction petition is reversed, and the cause is remanded for further proceedings.

¶ 100 Reversed and remanded.